**9th Circuit No. 15-10492**

**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE NINTH CIRCUIT**

_____

United States of America,

Plaintiff-Appellee,

v.

Victor Manuel Torres,

Defendant-Appellant.

_____

Appeal from the United States District Court for the Northern District of
California, San Jose Division
Hon. Judge Edward J. Davila, United States District Judge
Case No. CR-14-00255-EJD

_____

**APPELLANT'S OPENING BRIEF**

_____

Adam G. Gasner
California Bar No. 201234
The Law Office of Adam G. Gasner
345 Franklin Street
San Francisco, CA 94102
Telephone: (415) 782-6000; Email: adam@gasnerlaw.com

Attorney for Defendant-Appellant
VICTOR MANUEL TORRES

# TABLE OF CONTENTS

STATEMENT OF JURISDICTION ................................................................1

QUESTIONS PRESENTED ........................................................................2

APPELLANT'S BAIL STATUS ..................................................................3

STATEMENT OF THE CASE .....................................................................3

STATEMENT OF FACTS ...........................................................................4

1. Victor Manuel Torres's Background ..........................................................4

2. Offense Conduct ........................................................................6

3. The District Court's Denial of Appellant's Motion to Dismiss the Indictment ..................................................................................7

  I. The parties' arguments .............................................................7

  II. The district court's order denying the motion to dismiss the indictment ............................................................................9

4. District Court Trial Proceedings and Disposition in Court .........................9

INTRODUCTION ....................................................................................11

SUMMARY OF ARGUMENT ..................................................................13

ARGUMENT ................................................................16

1.  The Second Amendment encompasses undocumented aliens because they are, and always have been, part of "the people" ...............................17

2.  The circuits that have confronted challenges to § 922(g)(5) have erroneously conflated two distinct issues.........................................25

3.  If this court decides that not all undocumented aliens are covered by "the people" this Court should apply the Supreme Court's substantial connections test29

4.  18 U.S.C 922(g)(5) violates appellant's Second Amendment rights, on its face and as applied in this case ........................................34

   I.   Standard of Review.................................................34

   II.   The undocumented alien prohibition is too recent to qualify for *Heller's* presumption of validity .................................37

   III.   Section 922(g)(5) is unconstitutional because the government has not, and cannot, satisfy strict scrutiny ................................38

   IV.   Even if this Court were to apply intermediate scrutiny, § 922(g)(5) would still not pass constitutional muster ...................48

5.  18 U.S.C. 922(g)(5) violates appellant's Fifth Amendment due process rights, on its face and as applied in this case ................................57

   I.   Standard of Review.................................................57

   II.   Substantive Due Process.......................................58

   III.   Equal Protection..................................................59

CONCLUSION .............................................................62

STATEMENT REGARDING ORAL ARGUMENT.....................................64

CERTIFICATE OF RELATED CASES .........................................65

CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 32-1 ..............66

CERTIFICATE OF SERVICE .........................................................................67

CERTIFICATE OF COMPLIANCE ............................................................68

# TABLE OF AUTHORITIES

## Cases

*Almeida-Sanchez v. United States*
413 U.S. 266, 274 (1973) ................................................................19

*Am.-Arab Anti-Discrimination Comm. v. Reno*
70 F.3d 1045, 1066 (9th Cir. 1995)..................................................20

*Arizona v. United States*
132 S.Ct. 2492, 2505 (2012) ...................................................... 8, 44

*Barrett v. United States*
423 U.S. 212, 218 (1976) ................................................................47

*Bd. of Trustees of State Univ. of N.Y. v. Fox*
492 U.S. 469, 480–81 (1989) ..........................................................50

*Bernal v. Fainter*
467 U.S. 216, 219-21 (1984).............................................................60

*Boy Scouts of Am. v. Dale*
530 U.S. 640, 648 (2000) ................................................................43

*Buckley v. Valeo*
424 U.S. 1, 93 (1976) ......................................................................59

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*
508 U.S. 520, 546 (1993) ................................................................44

*Citizens United v. FEC*
558 U.S. 310, 340 (2010) ................................................................43

*District of Columbia v. Heller*
544 U.S. 570 (2008) ..........................................................................8

*Fiallo v. Bell*
430 U.S. 787, 792 (1977) ................................................................54

*Fla. Dept. of Rev. v. Piccadilly Cafeterias, Inc.*
554 U.S. 33, 39 (2008) ....................................................................17

*Hague v. Comm. for Indus. Org.*
307 U.S. 496, 519 (1939) ................................................................20

*Ibrahim v. Dep't of Homeland Sec.*
669 F.3d 983, 997 (9th Cir. 2012)............................................................. 20, 30

*INS v. Lopez-Mendoza*
468 U.S. 1032, 1038 (1984) .................................................................8

*Kachalsky v. Cnty. of Westchester*
701 F.3d 81, 93 (2d Cir. 2012).............................................................40

*Kim Ho Ma v. Ashcroft*
257 F.3d 1095, 1109 n.23 (9th Cir. 2001)...........................................19

*Lopez-Valenzuela v. Apraioi*
770 F.3d 772, 790–792 (9th Cir. 2014)................................................. 8, 54

*Matthews v. Diaz*
426 U.S. 67, 96 (1976) .............................................................. 26, 59

*McDonald v. Chicago*
561 U.S. 742, 767 (2010) ............................................................ 58, 61

*Noryke v. King*
681 F. 3d 1041, 1045–46 (9th Cir. 2012)...........................................41

*Peruta v Cnty. of San Diego*
742 F.3d 1144, 1175 (9th Cir. 2014)................................................ passim

*Plyler v. Doe*
457 U.S. 202, 210 (1982) ........................................................... passim

*Printz v. United States*
521 U.S. 898, 902 (1997) ..............................................................37

*Regents of University of California v. Bakke*
438 U.S. 265, 357 (1978) ..............................................................39

*Shaughnessy v. United States ex rel. Mezei,*
345 U.S. 206, 212 (1953) ..............................................................18

*Small v. United States*
544 U.S. 385 (2005) ......................................................................48

*Stanley v. Illinois*
405 U.S. 645, 651 (1972) ..............................................................39

*Theck v. Warden, I.N.S.*
22 F. Supp. 2d 1117, 1122 (C.D. Cal. 1998) ..................................................19

*Turner Broad. Sys., Inc. v. FCC*
512 U.S. 622 (1994) ........................................................................................42

*Tyler v. Hillsdale Cnty. Sherriff's Dep't*
775 F.3d 308, 328 (6th Cir. 2014)..................................................................42

*United States v. Bass*
404 U.S. 336, 344 (1971) ................................................................................45

*United States v. Brignoni-Ponce*
422 U.S. 873, 884 (1975) ................................................................................20

*United States v. Carpio-Leon*
701 F.3d 974, 982 (4th Cir. 2012)........................................................... 27, 28

*United States v. Chester*
628 F.3d 673 (4th Cir. 2010)....................................................................49, 50

*United States v. Cruikshank*
92 U.S. 542, 553 (1875) ............................................................................12, 22

*United States v. Flores*
663 F.3d 1022, 1023 (8th Cir. 2011)...............................................................25

*United States v. Garcia*
768 F.3d 822, 827 (9th Cir. 2014)...................................................................16

*United States v. Guitterez*
983 F.Supp. 905, 916 (N.D. Cal. 1998) .....................................................19, 20

*United States v. Huitron-Guizar*
678 F.3d 1164, 1169 (10th Cir. 2012)..............................................................27

*United States v. Martinez-Fuerte*
428 U.S. 543, 566 (1976) ................................................................................19

*United States v. Marzzarella*
614 F.3d 85, 97 (3d Cir. 2010)...................................................................41, 42

*United States v. Orellano*
405 F.3d 360, 368 (5th Cir. 2005)...................................................................47

*United States v. Playboy Entmt Grp., Inc.*
529 U.S. 803, 813 (2000) ...................................................................43

*United States v. Portillo-Munoz*
643 F.3d 437, 444–45 (5th Cir. 2011)...................................... passim

*United States v. Verdugo-Urquidez*
494 U.S. 259, 265 (1990) ....................................................... passim

*United States v. Williams*
616 F.3d 685, 692-94 (7th Cir. 2010) .............................................49

*United States v. Yancey*
621 F.3d 681, 684 (7th Cir. 2010)...................................................37

*Washington v. Glucksberg*
521 U.S. 702, 721 (1997) ....................................................... 36, 39

*Wong Wing v. United States*
163 U.S. 228, 237 (1896) ...............................................................18

*Yick Wo v. Hopkins*
118 U.S. 356 (1886) .......................................................................18

## Statutes

114 Cong. Rec. 16286, 16298 ........................................................45

18 U.S.C. § 3231 .............................................................................1

18 U.S.C. § 3742 .............................................................................1

18 U.S.C. § 922(g) ..........................................................................1

18 U.S.C. § 922(g)(5).......................................................... 2, 3, 4, 7

18 U.S.C. § 922(k) ........................................................................41

28 U.S.C. § 1291 .............................................................................1

8 U.S.C. § 1182 ..............................................................................8

California Penal Code § 25400(a)(1) ................................................3

Firearms Owners' Protection Act....................................................45

Gun Control Act ............................................................................................38

Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. 90-351 §
1201(a)(5), 82 Stat. 197, 236 (1968) ................................................... 37, 45

## Other Authorities

David T. Hardy, *The Firearms Owners' Protection Act: A Historical and Legal Perspective*, 17 CUMB. L. REV. 585, 600-601 n.79 (1987) ..............45

Madison's Report on the Virginia Resolutions (1800) reprinted in 4 Elliot's Debates 556 (2d. ed. 1836) ……………………………………………….. 17

President Barack Obama, national address (Nov. 20, 2014) ……………....56

Robert Dowlut, *The Right to Arms: Does the Constitution or the Predilection of Judges Reign?*, 36 OKLA L. REV. 65, 96 (1983) ………………………...52

*See* Rubén G. Rumbaut & Walter A. Ewing, The Myth of Immigrant Criminality and the Paradox of Assimilation: Incarceration Rates Among Native and Foreign-born Men 1, 4 (Spring 2007) …………………....52,53

The Honorable Karen Nelson Moore, Aliens and the Constitution, 88 N.Y.U. L. Rev. 801, 807 (2013) ……………………………………………………17

## Federal Rules

Circuit Rule 28-2.6(a) ..................................................................................65
Circuit Rule 30-1.10 ......................................................................................4
Circuit Rule 32-1 ..........................................................................................66
Federal Rule of Appellate Procedure 32 (a)(7)(c) ........................................66
Federal Rule of Criminal Procedure 32 ........................................................33
Rule 4 (b) (1)(A)(i) of the Federal Rules of Appellate Procedure ...................1

## Constitutional Provisions

Fifth Amendment ..........................................................................................57
First Amendment ...........................................................................................20
Fourteenth Amendment .................................................................................59
Fourth Amendment ........................................................................................21
Second Amendment .......................................................................................21
Sixth Amendment ..........................................................................................18
Fourteenth Amendment .................................................................................60

## STATEMENT OF JURISDICTION

This appeal is from a final judgment of conviction in a criminal case, entered by the district court on May 12, 2015. The district court had jurisdiction under 18 U.S.C. § 922(g) and 18 U.S.C. § 3231. This Court has jurisdiction on appeal under 28 U.S.C. § 1291 and 18 U.S.C. § 3742. Mr. Torres appeals the district court's order denying his motion to dismiss entered on February 2, 2015. A Notice of Appeal was timely filed on October 9, 2015 following the Judgment pursuant to Rule 4 (b) (1)(A)(i) of the Federal Rules of Appellate Procedure.

## QUESTIONS PRESENTED

This appeal presents four issues:

1. The First, Second, and Fourth Amendments all use the term "the people." The First and Fourth Amendments apply to undocumented aliens. Does the concurrently passed and identically phrased Second Amendment also encompass undocumented aliens?

2. In order to completely restrict an individual's Second Amendment right, as Congress did in 18 U.S.C. § 922(g)(5), the government must show at least a substantial relation to a compelling justification. At its passage, Congress provided no findings or statistics with regard to the law's purpose, nor have they to date. Can the complete ban in § 922(g)(5) survive strict or heightened scrutiny without a substantial tie to an important governmental interest or narrow tailoring to a compelling government interest?

3. Does the statute prohibiting firearm possession by undocumented aliens, 18 U.S.C. § 922 (g)(5), violate Victor Manuel Torres's Second Amendment rights?

4. Does the statute prohibiting firearm possession by undocumented aliens, 18 U.S.C. § 922 (g)(5), violate Victor Manuel Torres's Fifth Amendment due process rights?

## APPELLANT'S BAIL STATUS

Mr. Torres is currently in custody. He was sentenced to a term of 27 months.

Appellant is currently serving his 27-month sentence in the custody of the United States Government. He is not out on bail pending appeal.

## STATEMENT OF THE CASE

After initially being charged in California Superior Court with, among other offenses, carrying a concealed firearm in a vehicle in violation of California Penal Code § 25400(a)(1), the case was removed to federal court. Subsequently, on or about April 2, 2014, Mr. Torres was charged in a criminal complaint with being an alien unlawfully in the United States in possession of a firearm in violation of 18 U.S.C. § 922(g)(5),[1] and he was subsequently ordered to be detained pending trial. On or about May 7, 2014, the appellant was charged in a single-count indictment with being an alien unlawfully in the United States in possession of a firearm. (ER092–096). On May 9, 2014, Mr. Torres entered a plea of not guilty to the charge in the Indictment.

---

[1] Providing in part that "[i]t shall be unlawful for any person who, being an alien . . . illegally or unlawfully in the United States . . . to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition."

On December 21, 2014, Mr. Torres filed a motion to dismiss the indictment, arguing that 18 U.S.C. § 922(g)(5) violates several amendments to the United States Constitution, most notably the Second Amendment. The motion to dismiss the indictment was denied, and Mr. Torres was subsequently found guilty at trial for violation of 18 U.S.C. § 922(g)(5). On September 28, 2015, Mr. Torres appeared before the Honorable Judge Edward J. Davila and was sentenced to 27 months of incarceration followed by a three (3) year term of supervised release and a $100.00 special assessment fee. (ER002–007).[2] Mr. Torres timely appealed. (ER001).

## STATEMENT OF FACTS

### *1. Victor Manuel Torres's Background*

Mr. Torres was born on December 21, 1985, in Ruiz Cortines, Tangancicuaro, Michoacan. He is the oldest of three surviving children born to the union of Ms. Elena Medoza Vargas and Mr. Avelino Torres Becerra. (PSR ¶ 37).

Mr. Becerra first migrated to the U.S. in 1989. The following year, when Mr. Torres was four years old, his mother migrated with Mr. Torres and

---

[2] "ER" refers to the Excerpts of Record filed concurrently with this brief. "PSR" refers to the Presentence Report, filed under seal pursuant to Circuit Rule 30-1.10.

his sister, Alma Delia Torres, to join her husband in San Jose, California. (PSR ¶ 38).

Mr. Torres had a meager upbringing—his father worked as a landscaper and his mother was a homemaker. (PSR ¶ 37). Mr. Torres attended public primary and secondary schools, but like the rest of his family, never received a higher education. (PSR ¶ 38). With his father often absent from the home as a result of being the primary income-earner in the family, gang affiliations prevailed over young minds in the area because gang membership provided resources and protection. Mr. Torres was no exception to such influence. (PSR ¶ 38).

As a result, Mr. Torres's parents sent him to live in Mexico in 2002 when he was sixteen years old. (PSR ¶ 38). The appellant remained in Mexico until June 2005, when he returned to the U.S. at the age of nineteen. (PSR ¶ 39). Upon his return, Mr. Torres was gainfully self-employed as a professional landscaper and undertook other various landscaping jobs to financially support himself and his family. (PSR ¶ 50). In October 2010, Mr. Torres met his future wife, Ms. Samantha Alvarez, a U.S. citizen. (PSR ¶ 41). They began dating and moved in together in December 2011. On February 14, 2012, Mr. Torres and Ms. Alvarez were married in San Jose. The union, which has not produced any children, is pending divorce.

The Presentence Report noted no prior criminal history and no other arrests. (PSR ¶ 32). Mr. Torres maintains that the gun found in his vehicle was not his, but that he was holding it for an acquaintance. (PSR ¶ 11). Although he had a clear criminal record, because of his immigration status, he had committed a federal crime by being in possession of a firearm on behalf of another individual.

### 2.    *Offense Conduct*

On or about March 28, 2014, Officers James Wiens, David Nylander, Matthew Kirby, and Bill Hoyt of the Los Gatos Police Department ("LGPD") responded to a citizen complaint reporting a suspicious vehicle parked at or near an O'Reilly Auto Parts store on Los Gatos Boulevard in Los Gatos, CA. Upon Officer Wiens's arrival at the scene, he found Mr. Torres standing next to the pickup truck that had been described by the reporting party and noticed the driver's side door of the truck was open, and that Mr. Torres was cutting something on the bed of his truck with a box cutter.

Officer Wiens approached the appellant and asked him for identification. As Mr. Torres looked for his ID, he reached into his truck. Out of concern for the safety of other officers and himself, Officer Wiens stopped Mr. Torres from reaching into his truck. Officer Wiens looked through the open driver's side door into Mr. Torres's truck and, although he did not see

Mr. Torres's identification, he saw a blue backpack in plain view. In an attempt to determine the identity of the appellant, Officer Wiens asked Mr. Torres if he, Wiens, could look into the backpack in Mr. Torres's truck. Mr. Torres consented to the officer's search. Officer Wiens opened the backpack and found a .22 caliber revolver. Mr. Torres was subsequently handcuffed and taken into custody. (PSR ¶ 6).

### 3. *The District Court's Denial of Appellant's Motion to Dismiss the Indictment*

#### I. The parties' arguments

Before trial, appellant moved to dismiss the one-count indictment on the grounds that § 922(g)(5) violates the Second, Fifth, and Fourteenth Amendments. (ER055). He argued that since the First and Fourth Amendments use the phrase "the people" and they extend rights to undocumented aliens, the identical phrase "the people" in the Second Amendment also extends its protection to undocumented aliens. (ER056).

Appellant further argued that the statutes categorical ban on all undocumented aliens from possessing a firearm is unconstitutional. (ER054). It is, in other words, an impermissible restraint on appellant's Second Amendment rights. (ER054). Appellant further argued that § 922(g)(5) violates the Fifth and Fourteenth Amendment's right to equal protection, because it burdens a right that is fundamental and enumerated in the Bill of

Rights without being narrowly tailored to serve a compelling government interest. (ER056).

In opposition, the government argued, that like the other classes of individuals legitimately prohibited by § 922(g) from possessing firearms, undocumented aliens are similarly situated. The government maintained this analogy by arguing that undocumented aliens are culpable for their "continued" criminality,[3] even if they have no other record of illegal conduct. (ER059). The government relied on the dicta in *District of Columbia v. Heller,* 544 U.S. 570 (2008), to maintain that undocumented aliens do not possess a Second Amendment right by virtue of not being virtuous citizens. (ER060).

///

///

///

///

---

[3] In *Lopez-Valenzuela v. Apraioi*, 770 F.3d 772, 790–792 (9th Cir. 2014), however, this Court stated unequivocally, that being present in the United States without authorization is not a crime. *See also Arizona v. United States*, 132 S.Ct. 2492, 2505 (2012) ("As a general rule, it is not a crime for a removable alien to remain present in the United States." (citing *INS v. Lopez-Mendoza*, 468 U.S. 1032, 1038 (1984)). Rather, unlawful presence is a violation of federal immigration law, punishable with civil penalties such as deportation or removal. *See* 8 U.S.C. § 1182.

## II. The district court's order denying the motion to dismiss the indictment

The district court erred in denying appellant's motion to dismiss and overlooked Supreme Court precedent on the meaning of "the people" while simultaneously confounding, as other circuits have, the two distinct issues present in challenges to § 922(g)(5). To illustrate, the district court began its analysis by considering whether undocumented aliens are part of "the people" of the Second Amendment. (ER064). Although the court stated that the concept of categorically excluding undocumented aliens is "troubling" and unfair "when all of the other important amendments" do apply to that class of person, it nevertheless decided that the Second Amendment "doesn't apply to undocumented aliens," despite the inconsistency and unfairness inherent in excluding them from "the people" afforded Second Amendment rights. (ER065). The district court erroneously relied on the flawed analysis offered by other circuits in concluding that undocumented aliens are not part of "the people." (ER065). Thus, the court ruled that the statute was a valid exercise of congressional authority to restrict a constitutional right. (ER065).

### 4. *District Court Trial Proceedings and Disposition in Court*

Trial below focused on the government's allegation that appellant was in violation of 18 U.S.C. § 922(g)(5)(a). In Count 1 of the Indictment, the

government charged as follows: 1) appellant was an alien illegally and unlawfully in the United States, and 2) appellant was in possession of the firearm found in a backpack in his truck.

In an attempt to prove that count at trial, the government presented a panoply of evidence aimed at showing that appellant is an undocumented alien. Despite significant effort on the part of the government to unequivocally establish appellant's status as an alien unlawfully in the United States, appellant concedes that this element of the charge is met and stipulates to this determination. The government also presented evidence that appellant had knowingly possessed the .22 caliber Taurus pistol recovered from a backpack in his car. Appellant, however, never disputed the fact that the gun was found in his car, that he had previously touched the gun, or that it was in fact found in a backpack in his truck. Appellant does, nonetheless, maintain the pistol belonged to an acquaintance.

In short, most of the evidence at trial was aimed at demonstrating that appellant, by way of his mother bringing him over as a child, had migrated to this country illegally, thereby establishing that appellant was an alien unlawfully present in the United States prohibited from possessing a firearm in violation § 922(g)(5). This appeal, however, concerns the facial

constitutionality of § 922(g)(5) and its application in appellant's case as
discussed below.

## INTRODUCTION

This criminal appeal is of extraordinary importance. Not only does its
resolution bear on the construction of the sacred right of self-defense
recognized by the Second Amendment to our federal constitution, but it
contemplates the deportation of a denizen of the United States who has lived
primarily in the United States since his infancy. By all measures, Mr. Torres
has accepted the national culture of the United States as his own and
understands himself to be an American. Having grown up in California since
the age of four after being brought to the United Stated by his mother, Mr.
Torres has come to undertake the responsibilities and obligations of a citizen
while simultaneously enjoying the many great privileges of being an
American.

At the heart of this case, however, is an issue broader than Torres's
possession of a handgun. It is whether undocumented aliens have a right to
defend themselves. Appellant's argument in favor of that right is straight-
forward: the right to defend oneself with a firearm is a pre-existing right,
codified in the Second Amendment, and shared among "the people"—the
same people who also enjoy the right to free speech and privacy. This Second

Amendment right extends to all people, including all undocumented aliens, whether virtuous or not. Thus, while the government would prefer that undocumented aliens like Mr. Torres be prohibited from possessing a single bullet,[4] this runs afoul of the Second Amendment and the natural right to defend oneself.[5]

For the reasons that follow, Mr. Torres respectfully submits that "the people"—the subjects of the Second Amendment's conferral of the right to bear arms—be given its ordinary and clearly delineated meaning, which includes citizens and non-citizens located within the geospatial confines of the United States. In accordance with the well-settled meaning of "the people" in the federal constitution, Mr. Torres respectfully submits that this Court find 18 U.S.C. §§ 922(g)(5) to be unconstitutional.

///

///

---

[4] *See* 18 U.S.C. § 922(g)(5) (prohibiting the possession of "any firearm *or ammunition* . . . which has been shipped or transported in interstate or foreign commerce" by aliens illegally or unlawfully in the United States (emphasis added)).

[5] *See Heller*, 544 U.S. at 592 (stating that "it has always been widely understood that the Second Amendment, like the First and Fourth Amendments, codified a *pre-existing* right" (emphasis in original)); *see also United States v. Cruikshank*, 92 U.S. 542, 553 (1875) (reasoning that the right to bear arms "is not a right granted by the Constitution. . . . Neither is it in any manner dependent upon that instrument for its existence").

## SUMMARY OF ARGUMENT

Human beings have a fundamental right to defend themselves. In the United States, the right to self-defense—specifically armed self-defense—is protected by the Second, Fifth, and Fourteenth Amendments to the federal constitution. The Second Amendment extends the fundamental right to possess a firearm to "the people." The Supreme Court has recognized that "the people" is a term of art, employed in select parts of the Constitution, referring to those who are "protected by the Fourth Amendment, and by the First and Second Amendments." *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990).

As a general rule, the Supreme Court has noted that "aliens receive constitutional protections when they have come within the territory of the United Stated and developed substantial connections with this country." *Verdugo-Urquidez*, 494 U.S. at 271. Undocumented aliens are protected under the First and Fourth Amendments, and thus cannot be subjected to warrantless searches, nor forbidden from practicing their faith or speaking freely in public. The Bill of Rights broadly includes undocumented aliens as a part of "the people." Thus, it follows that undocumented aliens are also members of "the people" under the Second Amendment.

Although the Fourth, Fifth, Eighth, and Tenth Circuits have considered

13

challenges to § 922(g)(5), those circuits have conflated the two relevant issues,[6] causing them to improperly narrow the scope of "the people" to exclude undocumented aliens. The paradox is striking: by way of tortured reasoning relying heavily on dicta from *Heller*, those circuits have adopted a reading of "the people" in the Second Amendment context to mean something different from "the people" for First and Fourth Amendment purposes.

Interpreting "the people" to exclude those unlawfully residing in the United States threatens to render undocumented aliens "vulnerable—to governmental intrusions on their homes and persons, as well as interference with their rights to assemble and petition the government for redress of grievances—with no recourse."[7] Appellant respectfully requests that this Court uphold key canons of constitutional interpretation by treating identical phrasing in the same manner and respecting the fact that the first ten

---

[6] The two distinct issues presented by challenges to § 922(g)(5) are: 1) whether undocumented immigrants are part of "the people" protected by the Second Amendment's right to bear arms, and, if so 2) whether § 922(g)(5) constitutes permissible infringement on the Second Amendment right of undocumented immigrants, should it be found to extend to them.

[7] *United States v. Portillo-Munoz*, 643 F.3d 437, 444–45 (5th Cir. 2011) (Dennis, J., dissenting).

amendments were adopted as a package.[8]

But if this Court declines to extend the Second Amendment to all members of "the people," it should read "the people" of the Second Amendment consistently with "the people" of the Fourth Amendment. This Court should thus follow the Supreme Court in *Verdugo-Urquidez* and apply the substantial-connections test in determining whether an undocumented alien possesses Second Amendment rights. And here, appellant's voluntary presence and adoption of societal obligations establishes substantial connections with his community and the country such that he would be covered by the Second Amendment. Appellant asks this Court to recognize that he is one of "the people" for whom the Second Amendment was written and that he has the right to possess a firearm to protect his home, his loved ones, and himself. Concluding otherwise effectively means that millions of similarly situated residents of the United States are 'non-persons' who have no rights to be free from unjustified searches of their homes and bodies and other abuses, nor to peaceably assemble or petition the government.

---

[8] Significantly, the Court in *Heller* began interpretation of the Second Amendment's text by noting the principle that the constitutional text is given its "normal meaning," excluding "secret or technical meanings that would not have been known to ordinary citizens in the founding generation." *Heller*, 540 U.S. at 577.

The government's arguments in opposition to this right are flawed. It contends that undocumented aliens are not included in the Bill of Rights' reference to "the people." But the government offers no support, nor can it, for the proposition that undocumented aliens are not covered by the First and Fourth Amendments, and by extension the Second Amendment. And nothing in our case law allows the substantial-connections test to rise or fall on whether a person is arguably a bad person. After all, the Constitution protects the despicable as well as the admirable.

Despite the Second, Fifth, and Fourteenth Amendments limitations on its legislative power, Congress acted to disarm millions of people living in the United States without any reason to believe that they were more likely than others to misuse firearms. Regardless of the precise form of scrutiny this Court applies, § 922(g)(5) cannot survive even the lowest available form of heightened scrutiny. Thus, this Court should reverse the district court, and find that § 922(g)(5) violates the Second Amendment, or alternatively, the Fifth and Fourteenth Amendments.

## ARGUMENT

The Court reviews a challenge to the constitutionality of a federal statute *de novo*. *United States v. Garcia*, 768 F.3d 822, 827 (9th Cir. 2014).

16

Appellant preserved the issues raised in this appeal through his motion to dismiss the indictment in the district court. (ER048).

1.      **The Second Amendment encompasses undocumented aliens because they are, and always have been, part of "the people"**

As with any statute, the use of identical phrasing within the Constitution was purposeful. *See Fla. Dept. of Rev. v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 39 (2008) (noting "identical words used in different parts of the same act are intended to have the same meaning" (internal quotation omitted)). The plain meaning of the text, principles of statutory interpretation, and logic compel finding the Bill of Rights covers undocumented aliens. Aliens, as people present in the United States, receive Constitutional protections. This is confirmed by the Founders' own words. Speaking on the rights of aliens, James Madison explained:

> [I]t does not follow, because aliens are not parties to the Constitution, as citizens are parties to it, that whilst they actually conform to it, they have no right to its protection.

Madison's Report on the Virginia Resolutions (1800) reprinted in 4 Elliot's Debates 556 (2d. ed. 1836). *See also* The Honorable Karen Nelson Moore, Aliens and the Constitution, 88 N.Y.U. L. Rev. 801, 807 (2013).

The Supreme Court has consistently found that other constitutional rights extend to aliens, including undocumented aliens. Early on, the Supreme Court protected undocumented aliens under the Constitution in the context of

17

equal protection. *See Yick Wo v. Hopkins*, 118 U.S. 356 (1886). In *Yick Wo*, the Supreme Court held that the Equal Protection Clause extends to aliens, reasoning: "[t]hese provisions are universal in their application, to all persons within the territorial jurisdiction, without regard to any differences of race, of color, or of nationality; and the equal protection of the laws is a pledge of the protection of equal laws." *Yick Wo* 118 U.S. at 369. Consistent with that reasoning, the Supreme Court then extended protections to undocumented aliens beyond the Equal Protection Clause that by recognizing that the Constitution included those individuals under the umbrella of the Fifth Amendment. *Wong Wing v. United States*, 163 U.S. 228, 237 (1896); *see also Plyler v. Doe*, 457 U.S. 202, 210 (1982) ("Aliens, even aliens whose presence in this country is unlawful, have long been recognized as 'persons' guaranteed due process of law by the Fifth and Fourteenth Amendments."). The Supreme Court has also found that the Sixth Amendment protects undocumented aliens. *See Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 212 (1953).

Undocumented aliens are also part of "the people" under the Fourth Amendment. *See United States v. Martinez-Fuerte*, 428 U.S. 543, 566

(1976).[9] This Court has expressly held that the Fourth Amendment applies regardless of an individual's formal immigration status. *See Kim Ho Ma v. Ashcroft*, 257 F.3d 1095, 1109 n.23 (9th Cir. 2001) ("The Supreme Court has held that . . . the Fourth Amendment applies to aliens (within U.S. territory)." (citing *Almeida-Sanchez v. United States*, 413 U.S. 266, 274 (1973))); *United States v. Guitterez*, 983 F.Supp. 905, 916 (N.D. Cal. 1998), *rev'd on other grounds*, 203 F.3d 833 (9th Cir. 1999) ("The Court . . . finds that the defendant," an undocumented immigrant, "has standing to assert a violation of the Fourth Amendment."); *Theck v. Warden, I.N.S.*, 22 F. Supp. 2d 1117, 1122 (C.D. Cal. 1998) (finding that petitioner, an excludable alien, "d [id] enjoy [Fourth Amendment] constitutional rights").

A contrary reading would affect not only undocumented aliens, but also persons who will be mistaken for undocumented aliens. For example, if the Fourth Amendment does not apply consistently to all searches and seizures within the United States, without regard to the subject's immigration status, law enforcement officers will be forced into the impossible position of having to make *ex ante* determinations about a person's immigration status prior to executing searches and seizures. Officers will be more likely to stop and

---

[9] Reasoning otherwise would ignore the countless cases applying the Fourth Amendment to all searches and seizures within the United States, such as in suppression motions, regardless of the subject's immigration status.

search those who seem "foreign" in the absence of probable cause or reasonable suspicion. Thus, categorically denying undocumented aliens Fourth Amendment protection would undermine "the inviolable protections traditionally afforded to persons accused of criminal conduct, including resident aliens and those who 'appear' to be aliens." *Guitterez*, 983 F. Supp. at 916; *see also United States v. Brignoni-Ponce*, 422 U.S. 873, 884 (1975) (Congress' immigration powers "cannot diminish the Fourth Amendment rights of citizens who may be mistaken for aliens").

It is beyond dispute that undocumented aliens are protected under the First Amendment and that the First Amendment applies without regard to citizenship. *See Am.-Arab Anti-Discrimination Comm. v. Reno*, 70 F.3d 1045, 1066 (9th Cir. 1995) ("We reject the government's contention that we apply gradations of First Amendment protection . . . in determining which citizens and aliens may receive particular government benefits."); *Ibrahim v. Dep't of Homeland Sec.*, 669 F.3d 983, 997 (9th Cir. 2012) (finding that a woman whose visa was revoked "has the right to assert claims under the First and Fifth Amendments"); *Hague v. Comm. for Indus. Org.*, 307 U.S. 496, 519 (1939) (Stone, J., concurring) ("It has been explicitly and repeatedly affirmed by this Court, without a dissenting voice, that freedom of speech and of assembly for any lawful purpose are rights of personal liberty secured to all

persons, without regard to citizenship, by the due process clause of the Fourteenth Amendment." (citations omitted)).

Thus, "the people" should have the same meaning in the Second Amendment as it does in the contemporaneously passed First and Fourth Amendments. *See Verdugo-Urquidez*, 494 U.S. at 265. Courts draw that understanding from the Amendments' language, structure, and purpose. Ratified at the same time, the First, Second, and Fourth Amendments all serve the same purpose: to limit government infringement of a personal right that existed before the Constitution's ratification. *Heller*, 554 U.S. at 592. Similar to the First and Fourth Amendments, the Second Amendment protects an individual right of "the people" that "shall not be infringed." *Heller*, 554 U.S. at 592. There is no evidence that the words 'the people' have a different connotation within the Second Amendment than when employed elsewhere in the Constitution.

All three amendments protect rights that existed at common law, before the creation of the Bill of Rights. *Id.* The Constitution did not create the right to speak freely or to bear arms. Instead, "it has always been widely understood that the Second Amendment, like the First and Fourth Amendments, codified *a pre-existing* right." *Id.* (emphasis in original). Over a century ago, the Supreme Court clearly stated that the right to bear arms "is

not a right granted by the Constitution. Neither is it in any manner dependent upon that instrument for its existence." *United States v. Cruikshank*, 92 U.S. 542, 553 (1875). It is because these rights existed before the Constitution, and the Bill of Rights enshrined them for "the people," that the First and Fourth Amendments protect the same "people" as the Second Amendment.

These cases exhibit that the Bill of Rights and other constitutional rights apply to undocumented aliens. This protection is based on the Supreme Court's recognition that the Constitution's protections extend beyond citizens. "Whatever his status under the immigration laws, an alien is surely a 'person' in any ordinary sense of that term," and therefore entitled to the protections of the Constitution. *Plyler*, 457 U.S. at 210. By using the phrase "the people," which includes citizens and non-citizens alike, the Framers sought to apply these rights to a broader, more inclusive population.

Nonetheless, some courts have relied on the following passage from *Heller* to support the idea that "the people" of the Second Amendment refers exclusively to a specific subset of citizens:

> And whatever else it leaves to future evaluation, it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home.

*Heller*, 554 U.S. at 634–635.

Relying on this language from *Heller,* the majority in *Portillo-Munoz*

determined that the Second Amendment applied only to those "law-abiding, responsible citizens" who qualify as part of the "political community." *United States v. Portillo-Munoz*, 643 F.3d 437, 440 (5th Cir. 2011) (quoting *Heller*, 554 U.S. at 580).[10] In the district court, the government similarly relied an overly broad reading of *Heller* to limit Second Amendment rights and the scope of "the people" to only law-abiding citizens.

But reliance on *Heller* to resolve the precise scope of "the people" in the Second Amendment is unwarranted for several reasons. First, the issue of whether undocumented persons are part of "the people" was not before the Court in *Heller*. *Heller*, 554 U.S. at 570 ("Whether the following provisions—D.C. Code §§ 7-2502.02(a)(4), 22-4504(a), and 7-2507.02—violate the Second Amendment rights of individuals who are not affiliated with any state-regulated militia, but who wish to keep handguns and other firearms for

---

[10] In his dissent, Judge James L. Dennis poignantly captured the consequences of such an unjustified and overly-broad reading of *Heller*.

> There are countless persons throughout Texas, Louisiana, and Mississippi, who, like Portillo-Munoz, work for employers, pay rent to landlords, and support their loved ones, but are unlawfully residing in the United States. The majority's reasoning renders them vulnerable—to governmental intrusions on their homes and persons, as well as interference with their rights to assemble and petition the government for redress of grievances—with no recourse.

*Portillo-Munoz*, 643 F.3d at 444–45 (Dennis, J., dissenting).

private use in their homes?"). Importantly, the Court mentioned no iterations of the word "immigrant" or "alien" in the opinion, as *Heller* did not intend to reach the question of the scope of "the people." Furthermore, there is no indication that the Court's passing references to "law-abiding citizens" were intentionally calculated to inform the meaning of "the people," or to establish that "the people" only includes citizens. It is possible that the Court used that language to indicate who, certainly, is part of "the people," rather than using that language to define the limits of "the people."[11] The Court itself indicated that it did not seek to "clarify the entire field" of Second Amendment jurisprudence, and left some questions open to future inquiry. *Heller*, 554 U.S. at 635.

Reading *Heller* to instead limit "the people" to citizens is a substantial departure from both the text of the Bill of Rights and past jurisprudence.[12] Thus, a narrow reading of *Heller* is appropriate, as the Court itself warned readers not to treat its decision as containing broader holdings than the Court

_____

[11] Notably, in recounting the history of the Second Amendment, the *Heller* Court interchangeably used a variety terms to describe "the people," such as "citizens" and "members of the political community."

[12] Such a reading directly contradicts the Supreme Court's reasoning in *Verdugo-Urquidez*, 494 U.S. at 265, which stated that undocumented aliens could be counted among "the people" protected by the Fourth Amendment upon a finding of an undocumented person's voluntary presence in the United States, coupled with acceptance of "some societal obligations."

set out to establish—namely, that the Second Amendment creates individual rights.

### 2. The circuits that have confronted challenges to § 922(g)(5) have erroneously conflated two distinct issues

Constitutional challenges to § 922(g)(5) present two distinct issues: (1) whether "the people" referred to in the Second Amendment includes undocumented aliens and, if so, (2) whether § 922(g)(5) constitutes a permissible infringement on undocumented aliens' Second Amendment rights, should the right be found to apply to them. The Fourth, Fifth, Eighth, and Tenth Circuits, in holding that undocumented aliens are not part of "the people" afforded Second Amendment protections relied heavily on reasoning and precedent that are inapposite to the threshold issue of whether undocumented aliens are part of "the people."

As the first federal circuit to consider the issue, the Fifth Circuit panel erred in its reasoning in *Portillo-Munoz*.[13] It is evident that the majority in *Portillo-Munoz* conflated the two issues because it in part justified its conclusion that Portillo-Munoz was not part of "the people" in light of

---

[13] Notably, the Eighth Circuit's per curiam opinion in *United States v. Flores* essentially incorporated by reference the reasoning from the majority opinion in *Portillo-Munoz*. *See United States v. Flores*, 663 F.3d 1022, 1023 (8th Cir. 2011). Therefore, critique of the Fifth Circuit's reasoning also applies to the Eighth Circuit's reasoning.

Congress's power to make "laws that distinguish between citizens and aliens and between lawful and illegal aliens." *See Portillo-Munoz*, 643 F.3d at 443 ("[T]he Supreme Court has long held that Congress has the authority to make laws governing the conduct of aliens that would be unconstitutional if made to apply to citizens." (citing *Matthews v. Diaz*, 426 U.S. 67, 96 (1976))). The majority explicitly stated that it considered Congress's aforementioned power to be "persuasive in interpreting the text of the Second Amendment." *Id.* at 442. Although congressional power is highly relevant—maybe even dispositive—to the second issue of whether the alien-in-possession statute violates the Second Amendment, it is inapposite to whether "the people" includes Portillo-Munoz. *See id.* at 448 (Dennis, J., dissenting) (explaining how the majority opinion reached the wrong conclusion by appealing to Congress's power to make laws that distinguish based on alienage).

Even granting that Congress may discriminate between aliens and citizens, that reality does not come to bear on the scope of "the people." *Id.* Defining the "who" of the Second Amendment is an interpretative question, not a policy matter. *See id.* (Dennis, J., dissenting) (emphasizing the irrelevance of applying intermediate scrutiny to determine the threshold question about the scope of the right). In essence, the majority relied on an analysis that should have been irrelevant to the inquiry. Similarly, the Tenth

26

Circuit suggested in *United States v. Huitron-Guizar*, 678 F.3d 1164, 1169 (10th Cir. 2012), that the very fact that Congress prohibited undocumented aliens from possessing guns may be dispositive that, as a class, undocumented persons categorically do not have any rights under the Second Amendment. *See id.* at 1169 ("That Congress saw fit to exclude illegal aliens from carrying guns may indicate its belief, entitled to our respect, that such aliens, as a class, possess no such constitutional right."). Oddly enough, the court went on to assume, *arguendo* for the purposes of the case at hand, that the Second Amendment could include undocumented aliens. *See id.* ("The apparent inconsistency in assuming the existence of a right before sustaining a law that acts as a blanket prohibition on it is, we believe, outweighed by the prudence of abstaining on a question of such far-reaching dimensions . . . .").

Nevertheless, that the Tenth Circuit conflated the issues, even while making a valiant effort to keep the two issues distinct. *See id.* (recognizing that the issue of alienage and the Second Amendment implicates two distinct issues while also emphasizing the importance to deferring to Congress).

The Fourth Circuit made a similar error when it confronted a challenge to the alien-in-possession statute. In *United States v. Carpio-Leon*, 701 F.3d 974, 982 (4th Cir. 2012), the panel stated that it would probe only into the first issue—whether the Second Amendment right extends to the

27

undocumented—and would not even reach the second step of the analysis. *See id.* ("[W]e hold that the Second Amendment right to bear arms does not extend to *illegal* aliens, and therefore, without the need of proceeding to the second step of *Chester*, we conclude that [the constitutional challenge] must fail." (emphasis in original)). Yet in its attempt to define the scope of "the people," the court discussed the theory that historically "the government could disarm unvirtuous citizens." *Id.* at 979. Contrary to the Fourth Circuit's analysis, the government's authority to disarm persons who are not law-abiding is not dispositive of whether undocumented immigrants qualify as "the people." *See id.* at 980–81. Instead, that is an inquiry in the second step of the analysis—a step that the Fourth Circuit claimed it would not reach in *Carpio-Leon.*

Perhaps the most blatant example of the critical conflation of the issues comes from the district court's decision below. During the motion to dismiss proceeding, the court stated that the Second Amendment does not apply to undocumented aliens "because of 922." (ER065) ("There's a rational basis for the Second Amendment and troubling as it is, perhaps define [sic] that there is at least one amendment that doesn't apply because of 922, doesn't apply to undocumented individuals when all of the other important amendments do and there is somewhat of a—it's not fair."). Indicative of the tortured

28

reasoning used to justify alienage exclusions from the Second Amendment, courts have employed similar circular reasoning to justify conclusions which are unjustifiable and inconsistent with settled precedent.

As one scholar presciently noted, the Fifth Circuit's eagerness to read "the people" more narrowly in the Second Amendment than in the Fourth Amendment underscores "the unique undercurrent of gun rights as a symbol of belonging in America."[14] Simply put, these decisions reflect a cultural feeling characterized by uneasiness at the possibility of extending gun rights to noncitizens.

### 3. If this court decides that not all undocumented aliens are covered by "the people" this Court should apply the Supreme Court's substantial connections test

Applying those precedents here, appellant first asserts that he need not show "substantial connections" to the U.S. because that demand has never been adopted by a majority of the Supreme Court as a prerequisite to asserting any constitutional right. As Justice Kennedy stated in his concurrence in *Verdugo-Urquidez*, fundamental rights such as those protected by the First,

---

[14] *See* Pratheepan Gulasekaram, Symposium, *Noncitizen Participation in the American Polity: Guns and Membership in the American Polity*, 21 WM. & MARY BILL OF RTS. J. 619, 627 (2012) ("Portillo-Munoz makes explicit what many may find implicitly or silently disquieting about guns and noncitizens in our constitutional order—that there is just something unsettling about extending gun rights to those who are not full members of the American polity.")

Second, and Fourth Amendments are not limited by the phrase "the people"; instead, that phrase demonstrates their importance and their individual, personal character. Under binding Ninth Circuit precedent, aliens are entitled to these constitutional protections if they are voluntarily present in the United States. *See Ibrahim v. Department of Homeland Sec.*, 669 F.3d 983, 994 (9th Cir. 2012) ("Even aliens who are in the United States illegally may bring constitutional challenges." (citations omitted)).

If this Court rejects the Framers' intended broad application of the Second Amendment to all persons present in the country, it should still apply the substantial connections test from *Verdugo-Urquidez*. Following that test, it should hold that appellant has substantial connections to the United States, and therefore is a member of "the people." Alternatively, the Court should remand for a hearing to determine appellant's status as a part of "the people" and subject to the Second Amendment through developing a record with regard to his substantial connections.

In *Verdugo-Urquidez*, the Supreme Court examined "the people" in the context of a Fourth Amendment challenge brought by an undocumented alien forcibly brought into the United States. *Verdugo-Urquidez*, 494 U.S. at 264–65. Reviewing the scope of the amendment, the Supreme Court said,

> 'the people' protected by the Fourth Amendment, and by the
> First and Second Amendments, and to whom rights and powers

30

> are reserved in the Ninth and Tenth Amendments, refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community.

*Id.* at 265.

The Supreme Court did not form a definitive holding as to who qualified for constitutional protections, but the five-justice opinion stated, "aliens receive constitutional protections when they have come within the territory of the United States and developed substantial connections with this country."[15] *Id.* at 271. The test for substantial connections has courts analyze: (1) whether the immigrant is voluntarily present in the United States; and (2) whether the immigrant has accepted "some societal obligations." *Id.* at 273.

---

[15] The opinion for the Court stated that constitutional protections extended to aliens "when they have come within the territory of the United States and developed substantial connections with this country." *Verdugo-Urquidez*, 494 U.S. at 271 (emphasis added). But one of the five justices who joined that opinion—Justice Kennedy—wrote separately to express disagreement with that aspect of the Court's opinion:

> [. . .] I cannot place any weight on the reference to "the people" in the Fourth Amendment as a source of restricting its protections. With respect, I submit these words do not detract from its force or its reach. Given the history of our Nation's concern over warrantless and unreasonable searches, explicit recognition of "the right of the people" to Fourth Amendment protection may be interpreted to underscore the importance of the right, rather than to restrict the category of persons who may assert it.

*Id.* at 276 (Kennedy, J., concurring) (emphasis added).

This Court has not addressed whether *Verdugo-Urquidez's* substantial connections test should apply in analyzing the Second Amendment. Since the Supreme Court has not defined "the people" in the Second Amendment, if a court must apply a test to undocumented aliens to determine whether the Constitution affords them certain rights, it should be *Verdugo-Urquidez's* substantial connections test.

Appellant is unquestionably in the country voluntarily, leaving only the question of acceptance of "societal obligations" under *Verdugo-Urquidez's* two prong test. Appellant presented the district court with several facts demonstrating substantial connections to the country. These include his residence in the United States for over 22 years upon being brought over to the United States by his mother when he was four years old (PSR ¶ 38); his attendance of elementary and middle school in San Jose Public Schools (PSR ¶ 38); as well as his relationships with his mother, father, wife (a U.S. citizen), and other immediate family, all of whom live in San Jose, (PSR ¶ 40–41).

Appellant could show that he was voluntarily present in the United States and assumed voluntary societal obligations, but the district court denied the motion without reaching these facts or holding an evidentiary hearing on the matter.

The Supreme Court in *Verdugo-Urquidez* did not lay down a 'good

person' test. It focused on whether there are substantial connections between the undocumented immigrant and this country. And in over twenty years here appellant has established more than enough connections to call them "substantial." Indeed, it is hard to imagine the government opposing an illegal search of appellant's home on the basis that he does not have Fourth Amendment rights; or it arguing that he could be arrested for speaking in a public forum because he doesn't have First Amendment rights. But it effectively makes these arguments when it contends that appellant lacks any Second Amendment rights because he does not have a substantial connection here.

While the Supreme Court in *Verdugo-Urquidez* held that sufficient, voluntary connections between an undocumented alien and the United States can give rise to constitutional protections, the Court did not create a bright-line rule. If, however, this Court finds that two decades in this country spent attending school and working are not enough, then this case should be remanded with instructions, so that a clearer picture of appellant's connections to this country can be established. Simply relying on the lack of facts developed in the Presentence Report would be inappropriate. The Presentence Report is, after all, focused on the mandates of Federal Rule of Criminal Procedure 32 and not on the question at hand: has a defendant

established substantial connections to this country, such that he is protected by the Second Amendment?

In sum, if this Court does not apply the historical, plain-text meaning of "the people" discussed above, appellant asks this Court to define the threshold level of connections and adoption of societal obligations that a defendant must establish in order to rely on the protections of the First, Second, and Fourth Amendments. And if this Court finds that the twenty-plus years appellant has spent here fails to establish such a connection, then it should remand this case for a hearing so that appellant can develop a record of the nature and extent of his connection to this country and thereby show that he meets the threshold as defined by this Court.

### 4. *18 U.S.C 922(g)(5) violates appellant's Second Amendment rights, on its face and as applied in this case*

### I. Standard of Review

Undocumented immigrants have a fundamental right to protect themselves and their homes with firearms. *See Peruta v Cnty. of San Diego*, 742 F.3d 1144, 1175 (9th Cir. 2014) (noting that "carrying weapons in public for the lawful purpose of self-defense is a central component of the right to bear arms"); *see also Heller*, 554 U.S. at 629 ("[R]egulations affecting a destruction of the right to *bear arms,* just like regulations that affect a destruction of the right to *keep arms,* cannot be sustained under any standard

of scrutiny." (emphasis in original)). Thus, a categorical ban on firearm possession by any undocumented immigrant with substantial connections to this country implicates a fundamental Second Amendment right.[16] The statute under which appellant was convicted criminalizes the very same conduct protected by the Second Amendment. The statute is violated by mere possession of a firearm, yet the Second Amendment explicitly protects "the right of the people to keep and bear arms." The question is whether such a ban can survive review under the Second Amendment. Appellant maintains it cannot.

While the Supreme Court has not yet identified the level of scrutiny applicable to federal firearms laws, it is clear that something more searching than rational basis review is required: "Obviously, the [rational-basis] test could not be used to evaluate the extent to which a legislature may regulate a specific, enumerated right, be it the freedom of speech, the guarantee against double jeopardy, the right to counsel, or the right to keep and bear arms." *Heller*, 554 U.S. at 628 n.27. Thus, a complete prohibition on appellant's Second Amendment rights, such as § 922(g)(5), must satisfy some form of heightened scrutiny.

---

[16] *See* Peruta v. Cnty. of San Diego, 742 F.3d 1144, 1170 (9th Cir. 2014) ("It is the rare law that 'destroys' the right, requiring *Heller*-style per se invalidation, but the Court has made perfectly clear that a ban on handguns in the home is not the only act of its kind.").

Much suggests that when evaluating the ban in § 922(g)(5), this Court should use strict scrutiny, as there is a presumption in favor of strict scrutiny when the government infringes on a fundamental right. *See Washington v. Glucksberg*, 521 U.S. 702, 721 (1997) (strict scrutiny applies to laws restricting a "fundamental" liberty); *Peruta v. Cnty. of San Diego*, 742 F.3d 1144, 1170 (9th Cir. 2014) (analogizing to First Amendment doctrine in analyzing prohibitions and restrictions in the Second Amendment context). Regardless of the form of heightened scrutiny, however, the government cannot demonstrate a sufficient tie to a valid government interest.

Even though the Supreme Court has removed rational basis review as an option for such constitutional challenges, *Heller*, 554 U.S. at 628–629 (rejecting rational-basis review), appellant nonetheless maintains that the statute could not even survive rational basis review.[17] Since Congress did not provide any statistics, data, or even debate in the congressional record on the subject of this particular subsection of the statute, absent evidence to the contrary, appellant assumes, as others have before him, that the statute's

---

[17] The Court in *Heller* noted that a law, that "under the pretence of regulating, amounts to a destruction of the right" would not pass constitutional muster "[u]nder any of the standards of scrutiny that we have applied to enumerated constitutional rights." *Heller*, 554 U.S. at 628–629. *See also Peruta v. Cnty. of San Diego*, 742 F.3d 1144, 1167 (9th Cir. 2014) ("Put simply, a law that destroys (rather than merely burdens) a right central to the Second Amendment must be struck down.").

objective is "suppressing armed violence." *United States v. Yancey*, 621 F.3d 681, 684 (7th Cir. 2010)). It is undoubtedly the rare law that "destroys" the right, requiring Heller-style per se invalidation, but the Court has made perfectly clear that a ban on handguns in the home is not the only act of its kind. *See Peruta v. Cnty. of San Diego*, 742 F.3d 1144, 1170 (9th Cir. 2014) (noting that the Second Amendment right is destroyed "when exercise of the right is limited to a few people, in a few places, at a few times").

## II. The undocumented alien prohibition is too recent to qualify for *Heller's* presumption of validity

Unlike other prohibitions contained within § 922(g), the prohibition in subsection (g)(5) is neither longstanding nor tailored to achieve any legitimate government interest. In 1968, Congress passed the Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. 90-351 § 1201(a)(5), 82 Stat. 197, 236 (1968), for the purpose of "establishing a federal scheme" to govern the "distribution of firearms." *See Printz v. United States*, 521 U.S. 898, 902 (1997). As part of the scheme, Congress barred certain categories of persons from possessing firearms. *See* 18 U.S.C. § 922(g) (prohibiting, for example, drug addicts, felons, and the mentally insane from possessing, shipping, transporting, or receiving firearms). In 1986, Congress amended the Gun

Control Act to include § 922(g)(5), prohibiting an "alien" unlawfully present in the United States from possessing a firearm.

In *Heller*, the Supreme Court identified general categories of firearm possession laws that would probably survive Second Amendment scrutiny:

> Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

*Heller*, 554 U.S. at 626–27.

The prohibition of firearm possession by undocumented aliens, however, is certainly not "longstanding." Because the undocumented alien prohibition is recent, it cannot fall within *Heller's* historical-prohibition exception to the individual right to bear arms.

### III. Section 922(g)(5) is unconstitutional because the government has not, and cannot, satisfy strict scrutiny

The Second Amendment protects appellant because "the people" encompasses undocumented aliens or because he has the requisite substantial connections to this country. Although courts do not always apply strict scrutiny when a fundamental right is involved, the Supreme Court has indicated that there should be a presumption in favor of strict scrutiny when

the government infringes on such a right. *See Glucksberg*, 521 U.S. at 721 (strict scrutiny applies to laws restricting a "fundamental" liberty).

Therefore, there is a presumption that strict scrutiny applies in reviewing laws that wholly deny individuals Second Amendment rights. "[A] government practice or statute which restricts 'fundamental rights' or which contains 'suspect classifications' is to be subjected to 'strict scrutiny' and can be justified only if it furthers a compelling government purpose and, even then, only if no less restrictive alternative is available." *Regents of University of California v. Bakke*, 438 U.S. 265, 357 (1978) (Brennan, J, concurring in judgment in part and dissenting in part). Where a statute infringes upon a core concern of an enumerated right or any other "basic civil rights of man," strict scrutiny applies. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972) (rights associated with fatherhood). Because possession of firearms for self-defense is a fundamental and enumerated right, and because § 922(g)(5) is directed specifically at the core conduct protected by the right, strict scrutiny should be applied here.

In fielding constitutional challenges to § 922(g)(5), courts have

generally applied either a form of intermediate scrutiny or strict scrutiny.[18]

Other courts have applied a heightened level of scrutiny that falls somewhere

between intermediate and strict. *See Kachalsky v. Cnty. of Westchester*, 701

F.3d 81, 93 (2d Cir. 2012). Because appellant's case involves the

infringement of a fundamental Second Amendment right, and in particular

because of the broad application of the prohibition, this Court should apply

strict scrutiny.

Although this Court has left open what level of scrutiny should apply in

Second Amendment cases, it has approvingly noted that "severe restrictions

---

[18] *Compare Tyler v. Hillsdale Cnty. Sheriff's Dep't*, 775 F.3d 308, 326 (6th Cir. 2014) (finding that strict scrutiny to be broadly applicable to Second Amendment cases), *and United States v. Marzzarella*, 614 F.3d 85, 97 (3d Cir. 2010) (recognizing that laws severely limiting or prohibiting the possession of firearms deserve strict scrutiny), *with United States v. Meza-Rodriguez*, 798 F.3d 664, 672 (2015) (noting that courts should apply a heightened form of scrutiny), *and United States v. Huitron-Guizar*, 678 F.3d 1164, 1169 (10th Cir. 2012) (explaining that the alien-in-possession statue must survive intermediate scrutiny, assuming as a threshold matter that the individual has demonstrated inclusion in "the people" of the Second Amendment), *and United States v. Reese*, 627 F.3d 792, 802 (10th Cir. 2010) (applying intermediate scrutiny to a Second Amendment challenge to § 922(g)(8) brought by a United States citizen), *and United States v. Booker*, 644 F.3d 12, 25 (1st Cir. 2011). *See also Portillo-Munoz*, 643 F.3d at 443 (5th Cir. 2011) (Dennis, J., dissenting) (advocating for the case to be remanded to the district court to determine "in the first instance the applicable level of scrutiny under the Second Amendment"). Even more nuanced, some courts have applied intermediate scrutiny to laws applying outside the home and strict scrutiny to laws affecting the right to self-defense within the home. *See United States v. Masciandaro*, 638 F.3d 458, 470 (4th Cir. 2011).

on the 'core' right have been thought to trigger a kind of strict scrutiny, while less severe burdens have been reviewed under some lesser form of heightened scrutiny." *Peruta*, 742 F.3d at 1167–1168 (citations omitted).[19] Strict scrutiny should be applied to laws which severely limit or prohibit the possession of firearms. The Third Circuit recognized this in *United States v. Marzzarella*, 614 F.3d 85, 97 (3d Cir. 2010). The court distinguished the District of Columbia's handgun ban at issue in *Heller* from 18 U.S.C. § 922(k), which merely prohibits possession of a firearm with an obliterated serial number. The latter provision did not "severely limit the possession of firearms," whereas the handgun ban was "at the far end of the spectrum of infringement on protected Second Amendment rights." *Id.* The court applied intermediate scrutiny to the obliterated serial number statute because it was less of a burden on the Second Amendment right than the wholesale ban on firearm possession. The rule that emerges from *Marzzarella* is that outright prohibitions on guns deserve strict scrutiny, whereas intermediate scrutiny should be applied to regulations that do not totally ban gun possession.

---

[19] In *Peruta*, this Court noted that circuits grappling with the issue of appropriate scrutiny in the Second Amendment context have agreed, "as a general matter," that "the level of scrutiny applied to gun control regulations depends on the regulation's burden on the Second Amendment right to keep and bear arms." *Peruta*, 742 F.3d at 1167 (quoting *Noryke v. King*, 681 F. 3d 1041, 1045–46 (9th Cir. 2012) (en banc) (O'Scannlain, J., concurring) (collecting cases)).

The Second Amendment is an area in which the Supreme Court has "strongly indicated that intermediate scrutiny should not be employed." *Tyler v. Hillsdale Cnty. Sherriff's Dep't*, 775 F.3d 308, 328 (6th Cir. 2014).[20] Many of the courts that apply intermediate scrutiny instead of strict scrutiny rely on *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622 (1994), to develop their Second Amendment scrutiny doctrine. *See, e.g.*, *United States v. Marzzarella*, 614 F.3d 85, 97 (3d Cir. 2010). The majority in *Heller*, however, explicitly rejected the portion of Justice Breyer's dissent in *Heller*, in which he argued for a balancing test based, in part, on *Turner*.[21] The Supreme Court reasoned, "[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad." *Heller*, 554 U.S. at 635.

---

[20] Although that opinion was vacated and rehearing en banc was granted on April 21, 2015, the reasoning is still instructive and persuasive.

[21] *Heller*, 554 U.S. at 634–35

> We know of no other enumerated constitutional right whose core protection has been subjected to a freestanding 'interest-balancing' approach . . . . The First Amendment contains the freedom-of-speech guarantee that the people ratified, which included exceptions for obscenity, libel, and disclosure of state secrets, but not for the expression of extremely unpopular and wrong-headed views. The Second Amendment is no different. Like the First, it is the very product of an interest balancing by the people—which Justice Breyer would now conduct for them anew.

Intermediate scrutiny is, therefore, not appropriate for a Second Amendment analysis when reviewing a ban completely restricting an entire group of people from exercising a fundamental right.

Additionally, the Second Amendment scrutiny analysis is derived from the First Amendment scrutiny framework. *See, generally, Heller,* 554 U.S. 570 (calling upon, and referring to, First Amendment jurisprudence in the Supreme Court's decision in *Heller*). The First Amendment scrutiny analysis gives a strong preference towards strict scrutiny, including when reviewing an infringement on political speech, freedom of association, or a content-based regulation. *See Citizens United v. FEC*, 558 U.S. 310, 340 (2010) (political speech); *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000) (freedom of association); *United States v. Playboy Entmt Grp., Inc.*, 529 U.S. 803, 813 (2000) (content-based speech). Since the First and Second Amendments protect rights of the same class of "people," it is reasonable to apply a similar form of scrutiny to laws restricting rights under those Amendments.

A categorical ban on the right to possess firearms cannot satisfy strict scrutiny. Strict scrutiny "requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Citizens United*, 558 U.S. at 340 (internal quotations omitted). A reviewing court looks to the government's objective in passing the law and

the means the government used to achieve this objective. *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993). If the government's stated "interests could be achieved by narrower ordinances that burde[n] [the right] to a far lesser degree," then the law fails as it is the government's burden to show that the less burdensome alternatives are not feasible. *Id.* at 534–540.

When it comes to the ban in § 922(g)(5), the law fails to distinguish amongst undocumented aliens, and treats all undocumented aliens the same— just by virtue of their status. But undocumented aliens are not all the same; they also possess inherent differences that this statute fails to reflect.[22] "Unauthorized workers trying to support their families, for example, likely pose less danger than alien smugglers or aliens who commit a serious crime." *Arizona v. United States*, 132 S.Ct. 2492, 2499 (2012). Yet, this statute does not consider these differences, especially when tied to the alleged governmental objectives. Instead, this statute categorizes all undocumented aliens uniformly, and Congress provided no record as to why.

Concerning a governmental interest, there is nothing in the legislative

---

[22] Many of the founders were intimately acquainted with rural and agricultural lifestyles, where firearms have always been a necessity to defend against the threat of beasts and brigands. They would probably be quite surprised to learn that, 220 years later, the federal government would imprison a farmhand because he carried a gun to protect himself and his animals.

history that provides the Government with a legitimate, or frankly any, justification for distinguishing between documented and undocumented aliens. Congress passed a variation of § 922(g)(5) as an amendment to Title VII of The Omnibus Crime Control and Safe Streets Act of 1968. It was not introduced with empirical data, or any data, establishing a connection between undocumented aliens and their alleged danger to society or firearms usage. Rather, the section came as a last-minute floor amendment proposed by Senator Russell Long (D-LA). In *United States v. Bass*, 404 U.S. 336, 344 (1971), the Supreme Court described Title VII as, "hastily passed, with little discussion, no hearings, and no report." Senator Long concluded what little explanation he provided with the command: "Several Senators: Vote! Vote!" David T. Hardy, *The Firearms Owners' Protection Act: A Historical and Legal Perspective*, 17 CUMB. L. REV. 585, 600-601 n.79 (1987) (citing 114 Cong. Rec. 14775).

The bill's expedited passage is reflected in the fact that, "[t]he amendment received only passing mention in the House discussion of the bill, 114 Cong. Rec. 16286, 16298, and never received committee consideration or study in the House either." *Bass*, 404 U.S. at 344 n.11. Eventually, the ban found in Title VII was amended in 1986 with the passage of the Firearms Owners' Protection Act, and all prohibited persons were consolidated into a

single provision—§ 922(g). The legislative history of § 922(g)(5) reflects that the government did not pass the law with any announced objective, and consideration was certainly not given to whether it was narrowly tailored. Additionally, to the extent that violence prevention is the objective, the government has not, and cannot, show that undocumented aliens are, as a class, more violent than the population at large.

When Congress enacted § 922(g)(5), it provided no statistics to show that undocumented aliens are more violent than documented aliens or the public at large. In part because of the absence of an adequate legislative record, appellant is unable to provide statistics speaking to crimes committed by undocumented aliens when Congress passed amended law in 1986. Current statistics, however, indicate that undocumented aliens do not commit violent crimes at a higher rate than documented aliens or the broad public, and there is no reason to believe that this would not have been true in the 1980's as well.

Courts has previously speculated about the congressional purposes that may have motivated the undocumented alien prohibition. In considering the general purpose of § 922(g), courts have noted that the purpose of the statute is that of keeping firearms out of the hands of those typically considered dangerous or irresponsible. *See Barrett v. United States*, 423 U.S. 212, 218

(1976) ("The very structure of the Gun Control Act demonstrates that Congress did not intend merely to restrict interstate sales but sought broadly to keep firearms away from the persons Congress classified as potentially irresponsible and dangerous."). Despite extensive examination of the legislative history of the predecessors to § 922(g), discussion or findings related to aliens are nonexistent. Courts are left to speculate that "by including illegal aliens within the ambit of Title VII's prohibitions, Congress evidently believed that such aliens came within the class of untrustworthy persons whose possession of firearms would constitute a threat to society." *United States v. Orellano*, 405 F.3d 360, 368 (5th Cir. 2005). The absence of congressional findings supporting the link between undocumented aliens and armed violence is fatal under strict or intermediate scrutiny. Even under deferential "rational basis" review, the absence of congressional findings supporting a law is highly relevant and may prove fatal.

Moreover, if there were congressional findings supporting a link between at least some undocumented aliens and armed crime, § 922(g) would still fail under strict scrutiny because Congress has available less restrictive means of avoiding armed violence. The most obvious way would be to narrowly tailor the prohibition to factors actually correlated with risk of violence, such as prior adjudications. For example, Congress could have

47

prohibited firearm possession by those aliens who had been convicted of a felony or any violent crime abroad; that prohibition would reach people not otherwise covered by § 922(g)(1) and would be entitled to the same presumption of validity as the felon ban itself. *See Small v. United States*, 544 U.S. 385 (2005) (holding that 18 U.S.C. § 922(g)(1) reaches only those who have been convicted in domestic courts).

The conduct prohibited by § 922(g)(5), possession of a firearm, is at the "core" of Second Amendment protection and is a fundamental and enumerated right. Therefore, strict scrutiny should apply, and the statute cannot satisfy that standard. There were no congressional findings supporting a link between undocumented aliens and crime, and the statute is not narrowly tailored to reach only those aliens likely to misuse firearms. In fact, the available evidence actually demonstrates the opposite—undocumented aliens are not more likely to commit violent crimes than others. Applying strict scrutiny to § 922(g)(5), appellant's conviction must be reversed.

### IV.  Even if this Court were to apply intermediate scrutiny, § 922(g)(5) would still not pass constitutional muster

While the Supreme Court has not provided a definitive standard to apply to Second Amendment challenges, § 922(g)(5) is unconstitutional under any form of heightened scrutiny. Even if intermediate scrutiny applies, the

government did not carry its burden of showing that the means (disarming peaceable but undocumented aliens) sufficiently fit the end (avoiding armed violence).

Some courts have suggested that some level of "intermediate scrutiny" may be appropriate for Second Amendment challenges. *See United States v. Chester*, 628 F.3d 673 (4th Cir. 2010) (applying intermediate scrutiny to § 922(g)(9)); *United States v. Williams*, 616 F.3d 685, 692-94 (7th Cir. 2010) (applying intermediate scrutiny to as-applied challenge to felon disarmament under § 922(g)(1)). Even under intermediate scrutiny, however, § 922(g)(5) fails. Neither logic nor data supports the notion that aliens in general, or undocumented aliens specifically, present a greater risk of causing armed violence. Peaceable aliens who are residing in the United States have the same need for self-preservation and self-defense as anyone else, and that need does not evaporate based upon expiration or absence of an immigrant visa.

In *Chester*, the Fourth Circuit vacated and remanded a conviction under § 922(g)(9) because the government did not "carr[y] its burden of establishing a reasonable fit between the important object of reducing domestic gun violence and §922(g)(9)'s permanent disarmament of all domestic-violence misdemeanants." *Chester*, 628 F.3d at 683. "Significantly," the court noted, "intermediate scrutiny places the burden of establishing the required fit"

49

between the important goal and the means selected to achieve it "squarely upon the government." *Id.* (citing *Bd. of Trustees of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480–81 (1989)).

In a challenge such as this, the analysis starts with the nature of the ban: what the government's objective in creating that ban is. As in examining the other bans contained in § 922(g), courts must critically look and ask what Congress's objective is in prohibiting a particular class of person from possessing a gun. Then the court must ask, "why is Congress infringing that person's Second Amendment right?" If the reason for the specific ban is not an important governmental objective, then the ban cannot be constitutional; if the ban is not substantially related to an important governmental interest, then the ban cannot be constitutional.

The prohibition on possession of firearms by undocumented aliens is different from the other prohibitions contained in § 922(g). While not every felon or domestic violence offender is violent or dangerous, as a general class, society was and is safer by keeping guns out of those persons' hands that, in general, have posed a very real danger to society. In that way, Congress sought to address a very real harm—armed mayhem—by placing a categorical ban on a class of persons The same cannot be said about undocumented immigrants or the ban in § 922(g)(5).

Indeed, in *Heller*, the Supreme Court noted that some prohibitions are "presumptively lawful," but that list contains the obvious—felons and the mentally ill. *Heller*, 554 U.S. at 627, n.26. Importantly, the qualifying adverb, "presumptively," necessarily implies that there must exist the possibility that the ban could be unconstitutional in the face of an as-applied challenge. Many of the "presumptively lawful" prohibitions require proof that the defendant experienced some prior, significant legal event, such as a felony conviction, a misdemeanor domestic violence conviction, a domestic violence restraining order, or a dishonorable discharge. In these categories, a person retains his Second Amendment rights until a court makes a case-specific determination that that particular person is dangerous or deserves punishment. Other prohibitions, such as those applicable to someone "addicted to any controlled substance," 18 U.S.C. § 922(g)(3), or someone who "has been adjudicated as a mental defective," 18 U.S.C. § 922(g)(4), are likewise directly correlated to individual circumstances which render a particular person less fit to use a firearm responsibly. Subsection (g)(5), however, reaches millions of peaceable people on the basis of non-compliance with civil immigration laws alone.

The government made no attempt to shoulder its burden below to justify this outright prohibition for an entire category of individuals. Nor

could it; the prohibition on gun possession by undocumented aliens has no

rational connection to dangerousness or to unlawful use of firearms.

"[I]nfants, idiots, lunatics, and felons" were historically disarmed because the

danger that they would misuse firearms outweighed any interest in self-

defense. Robert Dowlut, *The Right to Arms: Does the Constitution or the*

*Predilection of Judges Reign?*, 36 OKLA L. REV. 65, 96 (1983). There is no

similar evidence presented here; instead, the available research demonstrates

the opposite: that even as the undocumented population doubled to 12 million

from 1994 to 2007, the violent crime rate in the United States has declined

34.2 percent, and the property crime rate has fallen 26.4 percent.[23] And when

researchers focused on those communities which include the bulk of

undocumented aliens (those who identify their background as Mexican,

Salvadoran, and Guatemalan), foreign-born aliens living in the United States

have much lower rates of incarceration than U.S.- born members of the same

---

[23] *See* Rubén G. Rumbaut & Walter A. Ewing, The Myth of Immigrant Criminality and the Paradox of Assimilation: Incarceration Rates Among Native and Foreign-born Men 1, 4 (Spring 2007), http:// www.immigrationpolicy.org/sites/default/files/docs/ ImmC#riminality(#IPC).pdf (accessed Feb. 7, 2011) ("At the same that immigration—especially undocumented immigration—has reached and surpassed historic highs, crime rates in the United Stats have declined, notably in cities with large immigrant populations (including cities with large numbers of undocumented immigrants such as Los Angeles and border cities like San Diego and El Paso, as well as New York, Chicago, and Miami).")

population. *Id.* at 3 (noting that among men age 18-39, who comprise the vast majority of the prison population, the 3.5 percent incarceration rate of the native-born in 2000 was five times higher than the 0.7 percent incarceration rate of foreign-born individuals. The misperception that foreign-born, especially undocumented aliens, are responsible for higher crime rates is deeply rooted in American public opinion and is sustained by media anecdote and popular myth. But this perception is not supported empirically. In fact, it is refuted by the preponderance of scientific evidence. *Id.*

The government also confuses its burden and misunderstands what this Court may consider in deciding whether to uphold the ban on undocumented alien possessing a firearm. The district court never had any briefing or heard evidence from the government about the purpose behind § 922(g)(5)' s ban. The government would likely proffer a purported connection between undocumented aliens and crime to supply a compelling governmental justification for Congress's passage of the bill over forty years ago. But to the extent that this Court thinks this argument might have some merit, it should not look at the question in the first instance but rather remand the case, so that the district court can hear evidence and make appropriate findings.

The government, however, would likely proffer three possible objectives for the Congressional ban on firearms found in § 922(g)(5)—

53

specifically, regulating firearms; preventing armed violence; or preventing undocumented aliens' access to firearms. But there is no way to assess the government's proposed objectives because the government cannot illustrate how the ban actually or sufficiently relates to the objectives. And for that matter, the government could not even establish that any of its proposed objectives were relied on by Congress in passing § 922(g)(5), because no congressional record or any findings on this matter were made by Congress.

The government can only speculate about objectives by offering post-hoc rationalizations. But even assuming that any of the government's proposed objectives was an actual ground for Congress's passage of § 922(g)(5), the government cannot meet its burden of showing that § 922(g)(5) is either the least restrictive means to meet that objective or even substantially related to those ends.

There is no denying that Congress has very broad power in regulating immigration. *See Fiallo v. Bell*, 430 U.S. 787, 792 (1977). Despite this undeniable power over immigration, that power cannot justify a law unrelated to immigration, which simply prohibits or regulates immigrants' Second Amendment rights. *See Lopez-Valenzuela,* 770 F.3d at 781 (noting that the Due Process Clauses of the Fifth and Fourteenth Amendments protect every person within the nation's borders from deprivation of life, liberty, or property

without due process of law, even one whose presence in this country is unlawful, involuntary, or transitory is entitled to that constitutional protection); *Verdugo-Urquidez*, 494 U.S. at 272–73 (9th Cir. 1990) (noting that Congress' power to exclude aliens cannot be interpreted so broadly as to limit the Fourth Amendment rights of all aliens present in the United States). Section 922(g)(5) imposes criminal liability on a class of persons for possessing a firearm or bullet—it does nothing to affect the admission, expulsion, or naturalization of undocumented immigrants.

Just as § 922(g)(5) does not affect immigration, it cannot be shown to prevent violence among a class of people who particularly need preventative measures. In sum, the government cannot show that a complete prohibition on the Second Amendment rights of undocumented aliens is related to an important governmental objective. If the proffered objective is to prevent violence, then a categorical ban on the possession of firearms by all undocumented aliens is overly broad—applied to a group the government cannot show is more violent than the country at large. If the objective is to regulate immigration, then Congress exceeded its authority because § 922(g)(5) does not relate to immigration itself, and instead only infringes the undocumented immigrants' Second Amendment rights. A law aimed at flatly denying all undocumented immigrants Second Amendment rights simply

cannot survive constitutional muster under any form of heightened scrutiny.

To the extent that this Court thinks the government's arguments about

Congress's objectives might have any merit, this Court should remand the

case so that the district court can examine the legislative record and so that the

government may produce evidence, if it can find any, establishing a

connection between undocumented immigrants, guns, and violent crimes.

The reality is that illegal immigrants are part of our society. See *Plyler*,

457 U.S. at 219, n.17. "[W]e are and always will be a nation of immigrants."[24]

Immigrants are not any more a cause of armed violence than society at large,

nor is criminalizing their possession of firearms a significant step towards

preventing armed mayhem. Without some stated justification that accords

with logic and reason, the government cannot sustain its burden and establish

that the regulation at issue is substantially related to an important

governmental objective. There is nothing in the legislative history of §

922(g)(5) that helps the government meet that burden.

Here, the government cannot point to an important governmental

interest for banning undocumented aliens from owning firearms, nor can it

establish that its objective is advanced by means substantially related to that

---

[24] President Barack Obama, national address (Nov. 20, 2014), *available at* http://www.whitehouse.gov/the-press-office/2014/11/20/remarks-president-address-nationimmigration.

important governmental interest. Thus, without a strong historical antecedent or a compelling public safety rationale, § 922(g)(5) fails Second Amendment scrutiny because it is neither substantially related nor narrowly tailored to avoidance of armed violence, or to any other acceptable legislative goal.

### 5. 18 U.S.C. 922(g)(5) violates appellant's Fifth Amendment due process rights, on its face and as applied in this case

Alternatively, the law violates the due process guarantee of the Fifth Amendment. Two aspects of the Due Process Clause are relevant here. First, assuming that the scope of protection afforded by the Second Amendment is limited, the Due Process Clause incorporates the same substantive right and offers it to all "person[s]," including undocumented aliens. Second, § 922(g)(5) violates the guarantee of equal protection of laws inherent in the Due Process Clause, because it discriminates against undocumented aliens and denies them the fundamental right of armed self-defense, and the conduct it prohibits has no logical connection to nationality or to governmental function. Because the law impermissibly discriminates against appellant on the basis of alienage, it must fail.

### I. Standard of Review

Like the Second Amendment challenge, the denial of appellant's Fifth Amendment due process challenge is reviewed *de novo*. A review of the

motion to dismiss transcript confirms that appellant reserved the right to appeal the denial of the motion in its entirety.[25]

## II. Substantive Due Process

Even if this Court concluded that appellant was not covered by the Second Amendment standing alone, he could nonetheless assert a right to armed self-defense under the substantive component of the Due Process Clause. In *McDonald v. Chicago*, the Supreme Court held that the "right to keep and bear arms is incorporated in the concept of due process." *McDonald v. Chicago*, 561 U.S. 742, 767 (2010). The Court reasoned that the right was fundamental to "our scheme of ordered liberty" and was "deeply rooted in this Nation's history and tradition." *Id*. (internal citations and quotation marks omitted). Aliens present in this country are guaranteed due process of law, and the right to armed self-defense is incorporated in the concept of due process.

///

///

---

[25] Appellant raised claims under the Second, Fifth, and Fourteenth Amendments in his motion to dismiss. At the motion hearing, the district court acknowledged appellant's due process and equal protection arguments (ER064) and later informed Torres at his sentencing hearing that he had reserved the right to appeal the order denying his motion to dismiss the indictment. (ER048).

### III. Equal Protection

Even though the Fifth Amendment has no explicit equal protection clause, the Supreme Court has held that "[e]qual protection analysis in the Fifth Amendment area is the same as that under the Fourteenth Amendment." *Buckley v. Valeo*, 424 U.S. 1, 93 (1976). Every person present in the United States, "[e]ven one whose presence in this country is unlawful, involuntary, or transitory is entitled to" constitutional due process. *Matthews v. Diaz*, 426 U.S. 67, 77 (1976). Because § 922(g)(5) burdens a right that is fundamental and enumerated in the Bill of Rights, strict scrutiny applies to the equal protection challenge. The law must be narrowly tailored to serve a compelling government interest.

In *Plyler*, the Supreme Court overturned a Texas law which forbade undocumented immigrant children from attending public schools. *Plyler*, 457 at 202. The *Plyler* opinion rejected the state's argument that undocumented immigrants could not claim the benefits of equal protection. *Plyler*, 457 U.S. at 210–15. Strict scrutiny did not apply because the case involved the right to a free public education, which is not an enumerated right, and it did not involve any traditional "suspect class." The Court, however, applied a heightened scrutiny based upon the importance of childhood education and the disfavored "underclass" status of undocumented immigrants:

Sheer incapability or lax enforcement of the laws barring entry into this country, coupled with the failure to establish an effective bar to the employment of undocumented aliens, has resulted in the creation of a substantial "shadow population" of illegal migrants--numbering in the millions--within our borders. This situation raises the specter of a permanent caste of undocumented resident aliens, encouraged by some to remain here as a source of cheap labor, but nevertheless denied the benefits that our society makes available to citizens and lawful residents. The existence of such an underclass presents most difficult problems for a Nation that prides itself on adherence to principles of equality under law.

*Plyler*, 457 U.S. at 218-19.

The Court therefore required more than a mere rational basis to support the law; the state was required to show that the discriminatory law actually "further[ed] some substantial goal of the State." Hypothetical justifications were not enough. The present case involves federal action, but that does not remove the requirement for the government to show, at the very least, that some substantial goal is actually furthered by the discriminatory disarmament law. The right to self-defense is not "bound up with the operation" of any governmental or political function, so it cannot be denied to aliens in the same way that, for example, voting or public office might. Moreover, the right to armed self-defense is personal, fundamental, and enumerated in the Bill of Rights. Therefore, strict scrutiny should apply to equal protection evaluation of this law. *See Bernal v. Fainter*, 467 U.S. 216, 219-21 (1984) (describing

narrow political function exception to the general rule that alienage classifications must survive strict scrutiny).

The absence of empirical support for the law, as described above, defeats any chance for success under strict scrutiny or under heightened scrutiny. This law is not tailored to disarm dangerous aliens, such as those convicted of violent crimes. Although Congress has a right to exclude the aliens of its choosing, once they are present in the United States, peaceable aliens are entitled to all the protections of due process, including the fundamental individual right to bear arms in self-defense. As *Heller* and *McDonald* demonstrate, that right necessarily involves the right to possess a handgun. Congress's decision to punish undocumented aliens merely because they exercised the fundamental right to possess a handgun for purposes of self-defense cannot withstand constitutional scrutiny.

///

///

///

///

///

///

///

## CONCLUSION

This appeal confronts issues which inflame the passions and provoke daily national discourse. Nonetheless, the faithful application of existing precedent, logic, and core constitutional principles leads to a straightforward analysis and conclusion. Appellant's interpretation of the Second Amendment accords with the basics of statutory construction—identical words used in different parts of the same act are given the same meaning. As part of "the people," appellant has First and Fourth Amendment rights, and he also has Second Amendment rights. To the extent that appellant's enjoyment of these rights is dependent on substantial connections with this country, his twenty-two-plus years in America more than suffice. By the general rules of statutory construction or the substantial connections test, appellant has Second Amendment rights.

Those rights can be abridged but not simply because one views undocumented aliens as 'non-virtuous.' Rather, there has to be a compelling governmental objective that prohibits some five million people living here peacefully, albeit undocumented, from possessing a firearm or even a single bullet. Thus, the government may deprive appellant of his Second Amendment rights only upon establishing a compelling governmental objective—and, here, it cannot even establish an important objective. Therefore, this Court should reverse and remand with instructions to dismiss

the case or, in the alternative, remand with instructions to engage in

evidentiary proceedings to establish relevant findings of fact.

DATE:  March 17, 2016                    By: *s/ Adam G. Gasner*

                                         _____

                                         Attorney for Appellant
                                         VICTOR MANUEL TORRES

## STATEMENT REGARDING ORAL ARGUMENT

Mr. Torres respectfully requests oral argument. This case raises important constitutional issues of first impression before this Court, and argument will help focus the parties' advocacy on the issues most important to the Court.

## CERTIFICATE OF RELATED CASES

To the best of my knowledge, there are no currently pending related cases within the meaning of Circuit Rule 28-2.6(a).

Pursuant to Rule 28-2.6(a) of the United States Court of Appeals for the Ninth Circuit, counsel for Defendant-Appellant hereby states that he is unaware of any cases related to this appeal.

DATE:  March 17, 2016                    By: *s/ Adam G. Gasner*

_____

Attorney for Appellant
VICTOR MANUEL TORRES

**CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 32-1**

Pursuant to Federal Rule of Appellate Procedure 32 (a)(7)(c), and Circuit Rule 32-1, I hereby certify that the foregoing brief uses 14 point times proportionately spaced type, that the text is double-spaced and footnotes are single-spaced. I further certify that according to the "word count" feature of the Microsoft Word program in which this brief is prepared, the total word count (not including the cover, tables, Certificate of Compliance with Rule 32-1, Statement Regarding Oral Argument, Statement of Related Cases, and Proof of Service) is 13,874 words.

DATE: March 17, 2016                    By: *s/ Adam G. Gasner*

                                                  _____

                                                  Attorney for Appellant
                                                  VICTOR MANUEL TORRES

**CERTIFICATE OF SERVICE**

I hereby certify that on March 17, 2016, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

By: *s/ Adam G. Gasner*

_____

Attorney for Appellant
VICTOR MANUEL TORRES

## CERTIFICATE OF COMPLIANCE

I hereby certify that the contents of this brief are exactly the same as

the brief I electronically filed with the Court on March 17, 2016.

Executed on March 17, 2016, in San Francisco, California.

By: *s/ Adam G. Gasner*

_____

Attorney for Appellant
VICTOR MANUEL TORRES