**No. 15-10492**

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

        v.

VICTOR MANUEL TORRES

    Defendant-Appellant.

_____

**BRIEF FOR THE UNITED STATES AS APPELLEE**
_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
NO. 5:14-CR-00255 EJD
_____

**BRIAN J. STRETCH**
United States Attorney

**BARBARA J. VALLIERE**
Chief, Appellate Division

**WILLIAM J. GULLOTTA**
Assistant United States Attorney
1301 Clay Street, Suite 340S
Oakland, CA 94612
(510) 637-3703

**Attorneys for Plaintiff-Appellee**
**July 15, 2016**                      **UNITED STATES OF AMERICA**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iii

JURISDICTION, TIMELINESS, AND BAIL STATUS ........................................ 1

ISSUE PRESENTED .................................................................... 2

STATEMENT OF THE CASE .............................................................. 2

    A.    Offense Conduct And Indictment ........................................ 2

        1.    Torres's illegal reentry into the United States ........................... 2

        2.    Torres's arrest on March 28, 2014 ............................................ 3

    B.    The Motion To Dismiss ................................................ 7

        1.    Torres's motion to dismiss ................................................ 7

        2.    The government's opposition to Torres's motion to dismiss ..... 8

        3.    The district court's hearing and order ........................................ 8

    C.    The Trial And Sentencing ............................................. 10

SUMMARY OF ARGUMENT ............................................................... 10

ARGUMENT .......................................................................... 11

    THE DISTRICT COURT PROPERLY FOUND THAT THE SECOND
    AMENDMENT DOES NOT APPLY TO ALIENS UNLAWFULLY IN
    THE UNITED STATES .................................................... 11

        A.    Standard Of Review .................................................. 11

        B.    Unauthorized Aliens Are Not Included In "The People"
            As Referenced In The Second Amendment ............................. 11

C.     Post-*Heller* Cases Consistently Hold That Unauthorized Aliens Do Not Have A Second Amendment Right To Bear Arms ................................................................................18

D.     Even If Some Unauthorized Aliens Are Covered By The Second Amendment, Torres Has Not Demonstrated "Substantial Connections" To The United States To Warrant Second Amendment Protections.................................22

E.     If The Second Amendment Does Apply To Unauthorized Aliens, Section 922(g)(5) Survives Intermediate Scrutiny.......24

     1.     Intermediate scrutiny applies...........................................24

     2.     Section 922(g)(5) has a substantial relationship to an important public purpose ................................................25

          a.     Crime control and public safety are important public purposes....................................................25

          b.     Section 922(g)(5) is substantially related to these important public purposes...........................26

F.     Section 922(g)(5) Does Not Violate The Fifth Amendment ....28

CONCLUSION ........................................................................................30

STATEMENT OF RELATED CASES ..................................................31

CERTIFICATE OF COMPLIANCE......................................................32

CERTIFICATE OF SERVICE ..............................................................33

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Bluman v. FEC*, 800 F. Supp. 2d 281 (D.D.C. 2011) ...............................................18

*Cabell v. Chavez-Salido*, 454 U.S. 432 (1982)........................................................17

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ..................................... *passim*

*Sugarman v. Dougall*, 413 U.S. 634 (1973) ...........................................................17

*United States v. Bena*, 664 F.3d 1180 (8th Cir. 2011)..............................................13

*United States v. Carpio-Leon*, 701 F.3d 974 (4th Cir. 2012) ......... 19, 20, 22, 28, 29

*United States v. Carranza*, 289 F.3d 634 (9th Cir. 2002).........................................11

*United States v. Chi Mak*, 683 F.3d 1126 (9th Cir. 2012) ................................ 11, 23

*United States v. Chovan*, 735 F.3d 1127 (9th Cir. 2013)................................... 24, 25

*United States v. Flores*, 663 F.3d 1022 (8th Cir. 2011)...........................................20

*United States v. Huitron-Guizar*, 678 F.3d 1164 (10th Cir. 2012)................. *passim*

*United States v. Kahre*, 737 F.3d 554 (9th Cir. 2013).............................................11

*United States v. Meza-Rodriguez*, 798 F.3d 664 (7th Cir. 2015) ... 20, 22, 25, 26, 28

*United States v. Navarro*, 800 F.3d 1104 (9th Cir. 2015) .......................................23

*United States v. Olano*, 507 U.S. 725 (1993) ........................................................11

*United States v. Portillo-Munoz*, 643 F.3d 437 (5th Cir. 2011) ........... 19, 20, 21, 27

*United States v. Robertson*, 52 F.3d 789 (9th Cir. 1994)........................... 22, 23, 28

*United States v. Rozier*, 598 F.3d 768 (11th Cir. 2010)...........................................13

*United States v. Toner*, 728 F.2d 115 (2d Cir. 1984)................................................27

*United States v. Valdez-Novoa*, 780 F.3d 906 (9th Cir. 2014) ...............................23

*United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990) ..................................7, 21

*United States v. Vongxay*, 594 F.3d 1111 (9th Cir. 2010)............................... 13, 24

*United States v. Yancey*, 621 F.3d 681 (7th Cir. 2010) ...........................................17

*Van Der Hule v. Holder*, 759 F.3d 1043 (9th Cir. 2014).........................................24

## U.S. CONSTITUTION

U.S. Const. art. I, § 2, cl. 2....................................................................................17

U.S. Const. art. I, § 3, cl. 3....................................................................................17

U.S. Const. art. II, § 1, cl. 5 ..................................................................................17

U.S. Const. amend. II..................................................................................... *passim*

U.S. Const. amend. V..................................................................... 7, 10, 28, 29

U.S. Const. amend. XV...........................................................................................17

U.S. Const. amend. XIX.........................................................................................17

U.S. Const. amend. XXIV ......................................................................................17

U.S. Const. amend. XXVI ......................................................................................17

## FEDERAL STATUTES

18 U.S.C. § 922(g)(5).................................................................................... *passim*

18 U.S.C. § 3231 ......................................................................................................1

18 U.S.C. § 3742......................................................................................................2

28 U.S.C. § 1291 ...............................................................................2

## STATE STATUTES

Cal. Health & Safety Code § 11364 ...................................................6

Cal. Health & Safety Code § 11377(a) ..............................................6

Cal. Penal Code § 466 ........................................................................6

Cal. Penal Code § 496(a) ...................................................................6

Cal. Penal Code § 25400(a)(1)...........................................................6

Cal. Penal Code § 33410......................................................................6

## OTHER AUTHORITIES

Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* 48 (1998) .... 13

2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 681 (1971) ....... 15

Don B. Kates, Jr., *The Second Amendment: A Dialogue*, 49 Law & Contemp.
   Problems 143 (1986) ........................................................................15

Don B. Kates, Jr., *Handgun Prohibition and the Original Meaning of
   the Second Amendment*, 82 Mich. L. Rev. 204 (1983)................................. 14, 17

Joyce Lee Malcolm, *To Keep and Bear Arms: The Origins of the Anglo
   American Right* 123 (1994) ...............................................................15

Patrick J. Charles, *"Arms for Their Defence"?: An Historical, Legal, and
   Textual Analysis of the English Right to Have Arms and Whether the
   Second Amendment Should Be Incorporated In McDonald v. City of Chicago*,
   57 Clev. State L. Rev. 351 (2009).....................................................14

Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early
   American Origins Of Gun Control*, 73 Fordham L. Rev. 487 (2004).......... 15, 16

Saul Cornell, *"Don't Know Much About History": The Current Crisis in Second Amendment Scholarship*, 29 N. Ky. L. Rev. 657 (2002) ........................16

No. 15-10492

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

           v.

VICTOR MANUEL TORRES,

      Defendant-Appellant.

_____

## BRIEF FOR THE UNITED STATES AS APPELLEE

Victor Manuel Torres ("Torres") appeals his conviction after a jury trial finding him guilty of one count of possession of a firearm by an unlawful alien in violation of 18 U.S.C. § 922(g)(5). Before trial, the district court denied Torres's motion to dismiss the indictment on the basis that Section 922(g)(5) violates the Second Amendment of the United States Constitution. Torres now appeals the district court's order denying his motion to dismiss. This Court should affirm.

## JURISDICTION, TIMELINESS, AND BAIL STATUS

The district court had jurisdiction under 18 U.S.C. § 3231. The district court entered its judgment on September 30, 2015, and Torres filed a timely notice of

appeal on October 9, 2014. ER 1-7.[1] This Court has jurisdiction under 18 U.S.C. § 3742 and 28 U.S.C. § 1291.

Torres was sentenced to a 27-month term of incarceration for violating 18 U.S.C. § 922(g)(5)(A), to be followed by a term of three years of supervised release. ER 3-4.

Following Torres's conviction and sentencing in this federal case, he was prosecuted by the State of California for other crimes arising out of the conduct that led to this prosecution. He was convicted of several state charges on March 9, 2016, and he remains in state custody while he awaits sentencing for those crimes.

## ISSUE PRESENTED

Whether an alien who is "illegally or unlawfully in the United States" is part of "the people" to whom the Second Amendment applies, and, if the Second Amendment does apply to an alien who is "illegally or unlawfully in the United States," whether 18 U.S.C. § 922(g)(5) survives intermediate scrutiny.

## STATEMENT OF THE CASE

### A.    Offense Conduct And Indictment

#### 1.    *Torres's illegal reentry into the United States*

Torres is a Mexican national present in the United States without authorization. Presentence Report ("PSR") ¶¶ 6, 37-40; Appellant's Opening Brief

---

[1] The Judgment incorrectly indicates that Torres pleaded guilty. ER 2.

("AOB") at 4. Torres reports that he was brought to the United States as a young child. PSR ¶ 38. He later became a member of the Sur Santos Pride ("SSP") street gang, which is a subset of the Sureños street gang. By his own admission, he had been a member of that gang for over 14 years at the time of his arrest in this case. *See* PSR ¶¶ 13, 38. In 2002, at the age of 16, Torres was expelled from school in San Jose, California as a result of his gang affiliation, and returned to Mexico at his parents' direction. PSR ¶ 38. After returning to Mexico, Torres illegally re-entered the United States at least three times after becoming an adult. PSR ¶ 39. Torres was not prosecuted or formally deported for any of these entries into the United States; rather, he was allowed to return voluntarily to Mexico. PSR ¶ 39.

### 2. *Torres's arrest on March 28, 2014*

On March 28, 2014, Los Gatos Police Department ("LGPD") Officers James Wiens, David Nylander, Matthew Kirby, and Bill Hoyt responded to a citizen's complaint reporting a suspicious vehicle parked at or near an O'Reilly Auto Parts store on Los Gatos Boulevard in Los Gatos, California. SER 20. The reporting party described Torres's vehicle as a green Chevrolet pickup truck, although the license plate that was on Torres's vehicle was registered to a Ford truck. SER 20. The reporting party was concerned, specifically, that Torres might be attempting to sell a stolen bicycle. SER 20.

Officer Wiens arrived at the parking lot near the O'Reilly Auto Parts and quickly located Torres standing next to the pickup truck described by the reporting party. SER 20. The driver's side door of Torres's truck was open, and Torres was cutting something in the bed of his truck with a box cutter. SER 20. The bed of the truck contained miscellaneous items, including bottles, cans, electronics parts, and "a newer looking Trek road bike." SER 20.

Officer Wiens looked through the open driver's side door into Torres's truck and saw what appeared to be counterfeit license plates. SER 21. Officer Wiens also saw a pair of black gloves on the front seat of Torres's truck, and a blue backpack behind the front seat. SER 21. Officer Wiens asked Torres about the bike that he could see in the bed of Torres's truck, and Torres told the officers that he owned the bike and had received it as a gift from a friend in December 2013. SER 21. On the bike, Officer Wiens could read the serial number and the name of the store (Summit Bicycle) that sold this particular bike. SER 21. He provided that information to the LGPD dispatcher to determine whether or not the bike had been stolen. SER 21. At this point, Officer Wiens was still unable to confirm Torres's identity, so he asked Torres if he could look into the backpack that was in Torres's truck, and Torres consented to the officer's search of the backpack. SER 21, 25. Officer Wiens opened the backpack and found inside it a fully-loaded

4

Herbert Schmidt .22 caliber revolver.  SER 21; PSR ¶ 6.  Officer Wiens placed

Torres under arrest.  SER 21.

The serial number on the revolver had been scratched up in an attempt to

remove it.  ER 46; PSR ¶ 21.  The backpack also contained bolt cutters and two

cylinders that appeared to Officer Wiens to be homemade silencers for the

revolver.  SER 21.

After the officers searched the backpack, LGPD dispatch reported that

Summit Bicycles confirmed that the bike in Torres's possession had been sold to a

person other than Torres.  SER 21.  Furthermore, the true owner of the bicycle had

reported it stolen on March 26, 2014, two days before.  SER 21.  Officer Nylander

searched Torres's truck and found a small amount of methamphetamine along with

a small glass pipe commonly used to smoke methamphetamine.  SER 21.

Meanwhile, Officer Wiens noticed two separate tattoos on Torres's body each

indicating membership in the Sur Santos Pride gang.  SER 21.

The officers took Torres to the LGPD temporary holding facility where they

read him his *Miranda* rights and interviewed him.  SER 21-22.  During the

interview, Torres said that he was an active member of the Sur Santos Pride gang,

and that the gun he possessed belonged to another SSP gang member who placed

the gun in Torres's truck the previous day.  SER 22.  Torres also told Officer

Wiens that the bolt cutters belonged to his friend, but he refused to provide his

friend's name. SER 22. Torres again insisted that he received the bike as a gift in December 2013, until Officer Wiens told him he was aware that the bike was stolen. SER 22. At this point, Torres admitted he knew the bike had been stolen, and that he knew the revolver, drugs, and stolen bike were in his truck. SER 22.

Before they left the parking lot near O'Reilly Auto Parts, officers interviewed Torres's wife, Samantha Alvarez, who had been working nearby at the time of Torres's arrest. SER 26. Alvarez told Officer Nylander that she knew there was a gun in Torres's truck. SER 26. She said that Torres told her it belonged to a friend of his, and that Torres was going to sell the gun and keep a portion of the proceeds of the sale. SER 26. She also told Officer Nylander that Torres has been a member of a gang, but she thought he had dropped out. SER 26.

Torres was subsequently charged in California Superior Court with (1) carrying a concealed firearm in a vehicle, in violation of Penal Code § 25400(a)(1); (2) receiving stolen property, in violation of Penal Code § 496(a); (3) possession of a controlled substance, in violation of Health & Safety Code § 11377(a); (4) possession of a silencer, in violation of Penal Code § 33410; (5) possession of controlled substance paraphernalia, in violation of Health & Safety Code § 11364; and (6) possession of burglary tools, in violation of Penal Code § 466.

A federal grand jury charged Torres with one count of being an unlawful alien in possession of a firearm, in violation of 18 U.S.C. § 922(g)(5)(A).[2]

## B.     The Motion To Dismiss

### 1.     Torres's motion to dismiss

Torres moved to dismiss the indictment based on a claim that Section 922(g)(5) violates the Second Amendment of the United States Constitution.  ER 100.  More specifically, Torres claimed that aliens unlawfully in the United States are "people," as that term is used in the Second Amendment, and are afforded Second Amendment rights.  SER 30.  Torres argued that simply being an alien unlawfully in the United States should not by itself preclude a person from possessing a firearm.  SER 31.

Torres did not raise any Fifth Amendment due process claims in his motion to dismiss.  Torres also did not argue in his motion to dismiss that he had developed "substantial connections" to the United States, and therefore he should be included among "the people" in the Second Amendment.[3]  Torres did not request an

---

[2] The indictment incorrectly refers to the firearm as a Taurus .22 caliber revolver, as it was described in the Wiens Report.  ER 93.  A superseding indictment was later filed that correctly identified the firearm as a Herbert Schmidt .22 caliber revolver.  ER 101.

[3] In his motion to dismiss, Torres cited *United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990), a case where the Supreme Court discussed constitutional protections for aliens who had developed substantial connections with the United States, but Torres never mentioned the substantial connections test to the district

evidentiary hearing.  SER 27-33; ER 51-91.  Torres also did not raise the issue of heightened scrutiny in his motion to dismiss.  SER 27-33.

### 2.    The government's opposition to Torres's motion to dismiss

In its opposition, the government argued that aliens unlawfully in the United States are not afforded Second Amendment rights.  SER 6-8.  The government also argued that Section 922(g)(5) is constitutional because Second Amendment rights are limited to law-abiding, responsible citizens, and Section 922(g)(5) does not apply to such persons.  SER 6-8.

### 3.    The district court's hearing and order

After briefing was completed, the district court held a motions hearing.  ER 51-91.  During the hearing, the government argued that under *District of Columbia v. Heller*, 554 U.S. 570 (2008), the individual right to bear arms protected by the Second Amendment is limited to "law abiding responsible citizens."  ER 60.  Aliens unlawfully in the United States by definition are not law-abiding or citizens and therefore they do not fall within the category of persons with rights under the Second Amendment.  ER 60.  The government also argued that Section 922(g)(5) has a rational basis; namely, "a concern for public safety and for crime control."  ER 60.

---

court or argued that he had developed those substantial connections.  SER 31; ER 51-91.

Torres acknowledged that the other subsections of Section 922(g) – which prohibit gun possession by felons, the mentally ill, and drug addicts, for example – create reasonable restrictions on gun ownership, have a rational basis, and are constitutional because some of the individuals who fall into those categories are dangerous. ER 58. Torres conceded that "there may be classes of undocumenteds that similarly fall into that category. . . ." ER 58. Torres also conceded that "[i]t could be said that undocumenteds are less likely to give their right address, harder to track, harder to follow." ER 56. Towards the end of his argument, Torres acknowledged that he did "agree that there are probably certain categories of undocumented aliens that should very justifiably be prohibited from possessing a firearm, and I do not disagree with that." ER 62.

Upon the conclusion of oral argument, the district court agreed with the government's position that Section 922(g) does not violate the Second Amendment, saying that "Congress does have a rational basis for making laws, for legislating in the areas of naturalization, and in the areas of exclusion and in the areas of security." ER 64. The district court continued, "I do think they have a rational basis to make these particular laws [Section 922(g)]. . . ." ER 64. Finally, the district court expressed its serious concern about the dangers associated with gun possession by undocumented risky individuals, and concluded that "Congress does have a rational basis for legislating in the Second Amendment area, and I do find

9

that 922(g) is constitutional based on that rational basis and that there is no constitutional infirmity to the Second Amendment vis-à-vis the facts and circumstances of this case." ER 65-66.

The district court denied Torres's motion to dismiss the indictment. ER 66.

## C.    The Trial And Sentencing

Torres was convicted by a jury of the sole count in the Superseding Indictment, ER 2; SER 1, and was sentenced to a 27-month term of incarceration and a three-year term of supervised release. ER 2-7. This appeal followed.

## SUMMARY OF ARGUMENT

The district court correctly denied Torres's motion to dismiss because aliens illegally or unlawfully in the United States are not afforded rights under the Second Amendment. Even if such aliens do enjoy rights under the Second Amendment, Section 922(g)(5) passes intermediate scrutiny and is constitutional. Finally, Torres did not raise a Fifth Amendment or Fourteenth Amendment due process claim before the district court, but had he raised it, it would have failed.

# ARGUMENT

# THE DISTRICT COURT PROPERLY FOUND THAT THE SECOND AMENDMENT DOES NOT APPLY TO ALIENS UNLAWFULLY IN THE UNITED STATES

## A.    Standard Of Review

A question regarding the constitutionality of a statute is a question of law, and it is reviewed *de novo*. *United States v. Carranza*, 289 F.3d 634, 643 (9th Cir. 2002).  This Court reviews factual findings for clear error.  *United States v. Kahre*, 737 F.3d 554, 565 (9th Cir. 2013).  "[C]onstitutional issues not originally raised at trial are reviewed for plain error."  *United States v. Chi Mak*, 683 F.3d 1126, 1133 (9th Cir. 2012).  Specifically, "[t]here must be an 'error' that is 'plain' and that 'affect[s] substantial rights.'"  *United States v. Olano*, 507 U.S. 725, 732 (1993).

## B.    Unauthorized Aliens Are Not Included In "The People" As Referenced In The Second Amendment[4]

The possession of firearms by aliens illegally or unlawfully in the United States (hereinafter, "unauthorized aliens") is not within the scope of the Second Amendment, and therefore Section 922(g)(5) does not violate the Constitution.

---

[4]  Torres claims he is raising both a facial and as applied challenge to the statute, AOB at 34-37, but he does not explain how the statute is unconstitutional as applied to him.  Indeed, during the hearing on the issue, Torres conceded that some "there are probably certain categories of undocumented aliens that should very justifiably be prohibited from possessing a firearm."  ER 62.  Torres never explained how he did not fall within those "categories of undocumented aliens" who should be precluded from possessing a firearm.  In any event, as explained *infra*, Section 922(g)(5) is both facially constitutional and constitutional as applied to Torres.

The Second Amendment provides that "the right of the people to keep and bear Arms, shall not be infringed." In *Heller*, the Court held that the Second Amendment "codified a *pre-existing* right" of individuals to keep and bear arms. 554 U.S. at 592 (emphasis in original). The scope of the right to bear arms therefore is informed by the "historical background" of the right. *Id.* "From Blackstone through the 19th-century cases," the Court stated, "commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* at 626. Accordingly, "the right secured by the Second Amendment is not unlimited." *Id*.

Although the Second Amendment is broadly phrased as applying to "the people," U.S. Const. Amend. II, the Court emphasized that the Second Amendment right historically has been enjoyed by "law-abiding, responsible citizens." *Id.* at 635. That language reflects the existence of "longstanding prohibitions on the possession of firearms" by certain classes of people, including "felons and the mentally ill." *Id*. at 626. These prohibitions, the Court explained, are "examples" of "presumptively lawful regulatory measures" limiting possession of firearms. *Id.* at 627 n.26. Accordingly, courts – including this Court – have upheld prohibitions on gun possession by felons and other classes of people on the ground that they are categorically disqualified from exercising Second Amendment rights. *See, e.g.*,

12

*United States v. Bena*, 664 F.3d 1180, 1184 (8th Cir. 2011) (holding that 18 U.S.C. 922(g)(8), which prohibits gun possession by persons subject to a domestic violence restraining order, is "consistent with a common-law tradition that the right to bear arms is limited to peaceable or virtuous citizens"); *United States v. Rozier*, 598 F.3d 768, 771 (11th Cir. 2010) (same regarding Section 922(g)(1)); *United States v. Vongxay*, 594 F.3d 1111, 1117-18 (9th Cir. 2010) (denying felons the right to bear arms is consistent with the purpose and history of the Second Amendment).

Because unauthorized aliens are not law-abiding, responsible citizens, they do not have the right to bear arms under the Second Amendment. Specifically, the Second Amendment does not extend the right to bear arms to aliens who have entered or remained in this country illegally. The historical evidence that informs the Second Amendment's scope, *Heller*, 554 U.S. at 591, demonstrates that the government traditionally had the authority to disarm people who were not part of the political community, as well as people who were perceived as potentially disloyal or dangerous.

At the time of the Founding, the right to bear arms was a "political right[]" that, like voting and serving on juries, was viewed as "essential to a state's political self-definition." Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* 48 (1998). Bearing arms was considered "critical to the state's

ability to assert its sovereignty and independence against a potentially tyrannous central government with a standing army." *Bill of Rights* 48. As a result, the right to bear arms was tied to membership in the political community. *Id*. ("Alien men and single white women circa 1800 typically could speak, print, worship, [etc.,] . . . but typically could not vote, hold public office, or serve on juries. These last three were political rights, reserved for First-Class Citizens. So too, the right to bear arms had long been viewed as a political right."). The right to defend the polity by serving in the militia did not extend to "those who were excluded because of perceived unfitness, untrustworthiness or alienage." Don B. Kates, Jr., *Handgun Prohibition and the Original Meaning of the Second Amendment*, 82 Mich. L. Rev. 204, 217 n.54, 232 (1983). Accordingly, "the Founders would not have understood the Second Amendment as extending" to those who were perceived as dangerous or to others excluded from service "on the ground of alienage." *Id.* at 217 n.54.

In addition, the English right to bear arms — which is understood to be a predecessor of the Second Amendment, *see Heller*, 554 U.S. at 593 — was limited by the government's ability to disarm those whom the government considered disloyal or dangerous. *See id*.; Patrick J. Charles, *"Arms for Their Defence"?: An Historical, Legal, and Textual Analysis of the English Right to Have Arms and Whether the Second Amendment Should Be Incorporated In McDonald v. City of Chicago*, 57 Clev. State L. Rev. 351, 376, 382-83 (2009); Joyce Lee Malcolm, *To*

14

*Keep and Bear Arms: The Origins of the Anglo American Right* 123 (1994) (*To Keep and Bear Arms*). In general, the right to bear arms was thought to be tied to the concept of the "virtuous citizen." Don B. Kates, Jr., *The Second Amendment: A Dialogue*, 49 Law & Contemp. Problems 143, 146 (1986). As a result, the "right to arms [did] not preclude laws disarming the unvirtuous citizens (i.e., criminals) or those . . . like children or the mentally unbalanced." *Id*.

Two early proposals for the Bill of Rights reflected the understanding that the right to bear arms did not extend to "potential subversives" and others who were not law-abiding members of the community. *See To Keep and Bear Arms* 140-41. Delegates urged the Massachusetts ratifying convention to recommend barring Congress from "prevent[ing] the people of the United States, who are peaceable citizens, from keeping their own arms." 2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 681 (1971). The New Hampshire convention similarly proposed that "Congress shall never disarm any Citizen unless such as are or have been in Actual Rebellion." *Id*. at 761.

During the American Revolution, colonial governments also disarmed persons who refused to "swear an oath of allegiance to the state or the United States." Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins Of Gun Control*, 73 Fordham L. Rev. 487, 506 & nn.128-29

15

(2004) (*A Well Regulated Right*) (compiling statutes). Such laws were designed to prevent those who were loyal to Great Britain from taking up arms against the States after arriving in the country. *Id.* For example, in 1776 Pennsylvania adopted a constitution that affirmed the right to bear arms, but shortly thereafter it enacted a series of Test Acts that conditioned the right on an oath of allegiance. Those enactments reflected an understanding that the right to bear arms was a "civic right, one that was limited to those members of the polity who were deemed capable of exercising it in a virtuous manner." Saul Cornell, *"Don't Know Much About History": The Current Crisis in Second Amendment Scholarship*, 29 N. Ky. L. Rev. 657, 671 (2002). Similarly, Massachusetts provided that those who had taken up arms against the State in Shay's rebellion could receive a pardon only after having been disarmed for three years and taking a loyalty oath. *A Well Regulated Right*, at 507-08.

The government's historical ability to disarm individuals who were not members of the political community or who were thought to be not law-abiding indicates that the Second Amendment right to bear arms does not extend to illegal aliens. Such individuals are present in the country only because they have entered (or have remained in the country) illegally. By definition, they are not part of the law-abiding, "virtuous citizenry" that was historically permitted to bear

16

arms. *Cf. United States v. Yancey*, 621 F.3d 681, 684-85 (7th Cir. 2010) (stating that "most scholars of the Second Amendment agree that the right to bear arms was tied to the concept of a virtuous citizenry and that, accordingly, the government could disarm unvirtuous citizens," and concluding that this history indicated that habitual drug users, though not a category that existed at the time of the Founding, may constitutionally be barred from possessing guns) (internal quotation marks omitted); *see Heller*, 554 U.S. at 626-27, 635.

Nor are unauthorized aliens "members of the political community," *Heller*, 554 U.S. at 580, that would have been understood to possess civic rights such as bearing arms. *See Handgun Prohibition*, at 271 n.54 (explaining that aliens were historically barred from possessing firearms); *cf., e.g*., U.S. Const. Amend. XV, XIX, XXIV, & XXVI (limiting voting rights to citizens); U.S. Const. Art. I, § 2, Cl. 2 (citizenship requirement for Representatives); U.S. Const. Art. I, § 3, Cl. 3 (citizenship requirement for Senators); U.S. Const. Art. II, § 1, Cl. 5 (the President must be a "natural born Citizen"). Indeed, the Supreme Court has long recognized the "State's historical power to exclude aliens from participation in its democratic political institutions," including by prohibiting aliens from voting or from holding high public office. *Sugarman v. Dougall*, 413 U.S. 634, 648-49 (1973); *see Cabell v. Chavez-Salido*, 454 U.S. 432, 439 (1982) ("The exclusion of aliens from basic governmental processes is not a deficiency in the democratic system but a

17

necessary consequence of the community's process of political self-definition."); *Bluman v. FEC*, 800 F. Supp. 2d 281, 287-88 (D.D.C. 2011) (the Supreme Court has established that foreign citizens may be denied rights that are tied to the process of democratic self-government) (collecting cases), *aff'd*, 132 S. Ct. 1087 (2012). Excluding unauthorized aliens from the right to bear arms is thus entirely consistent with the historical conception of the Second Amendment right as a civic right.

### C. Post-*Heller* Cases Consistently Hold That Unauthorized Aliens Do Not Have A Second Amendment Right To Bear Arms

Whether unauthorized aliens possess Second Amendment rights was not before the Supreme Court in *Heller*. However, the Court frequently connected the right to bear arms with citizenship or at least with membership in the political community. *See Heller*, 554 U.S. at 595 ("we do not read the Second Amendment to protect the right of citizens to carry arms for any sort of confrontation"); *id.* at 635 ("whatever else [the Second Amendment] leaves to future evaluation, it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home"); *see also United States v. Huitron-Guizar*, 678 F.3d 1164, 1168 (10th Cir. 2012) (noting "how frequently the opinion connected arms-bearing and citizenship"). The Supreme Court stated that "in all six other provisions of the Constitution that mention 'the people,' the term unambiguously refers to all members of the political community, not an

18

unspecified subset." *Heller*, 554 U.S. at 580. The Supreme Court continued, "[w]e start therefore with a strong presumption that the Second Amendment right is exercised individually and belongs to all Americans." *Id.* at 581. *Heller* thus supports that Second Amendment rights are connected to citizenship or membership in the national political community, and nothing in the opinion suggests that the Second Amendment extends to individuals who entered or are present in the United States unlawfully.

A post-*Heller* constitutional analysis first requires a determination of whether the challenged statute imposes a burden on conduct that is within the scope of the Second Amendment's right to bear arms. *United States v. Carpio-Leon*, 701 F.3d 974, 977 (4th Cir. 2012). If the conduct at issue – here, possession of a firearm by an illegal alien – is not within the scope of the Second Amendment, then the challenged statute is constitutionally valid. *Id.* at 977-78. If the statute does burden conduct within the Second Amendment, then the analysis moves to the second step of applying an appropriate form of scrutiny. *Id.*

Section 922(g)(5) does not burden conduct within the scope of the Second Amendment. "Whatever else the term means or includes, the phrase 'the people' in the Second Amendment of the Constitution does not include aliens illegally in the United States." *United States v. Portillo-Munoz*, 643 F.3d 437, 442 (5th Cir. 2011) *as revised* (June 29, 2011) (affirming denial of motion to dismiss in case in

which unlawful alien told police he possessed the gun to protect chickens from coyotes on the ranch where he worked). Almost every court to have addressed this issue has concluded that the term "the people," as used in the Second Amendment, does not include unauthorized aliens. *See, e.g., Carpio-Leon*, 701 F.3d 974; *Huitron-Guizar*, 678 F.3d 1164; *United States v. Flores*, 663 F.3d 1022 (8th Cir. 2011); *Portillo-Munoz*, 643 F.3d at 437.

Torres cites to several constitutional amendments that include the phrase "the people" and argues that all uses of that phrase extend to all persons, including aliens unlawfully in the United States. However, even if certain constitutional rights do extend to all persons – whether or not a person is a citizen or an illegal alien – it does not follow that unauthorized aliens have Second Amendment rights. *Huitron-Guizar*, 678 F.3d at 1167; *but see United States v. Meza-Rodriguez*, 798 F.3d 664, 670-73 (7th Cir. 2015) (holding, based on a Fourth Amendment analysis, that the Second Amendment applies to unauthorized aliens, but affirming denial of motion to dismiss because Section 922(g)(5) does not impermissibly restrict any Second Amendment rights such an alien might have), *cert. denied*, 136 S. Ct. 1655 (2016).[5] The scope of the Second Amendment, including its use of the term "the

---

[5] In a concurring opinion, Judge Flaum expressed "doubts that the Second Amendment grants undocumented immigrants the right to bear arms," and thought it best to "reserve resolution of this challenging constitutional question for a case that compels addressing it." *Meza-Rodriguez*, 798 F.3d at 673-74 (Flaum, J., concurring). The Tenth Circuit adopted this approach in *Huitron-Guizar*, where it

people," is informed by the unique history of the "pre-existing" right to bear arms that the Second Amendment codified. *Heller*, 554 U.S. at 591-92.

For instance, even if unauthorized aliens generally are covered by the Fourth Amendment, it does not follow that use of the term "the people" in both the Second and Fourth Amendments mandates that the two amendments cover the same groups of people. As the Fifth Circuit recognized, the amendments have different purposes, and "[a]ttempts to precisely analogize the scope of these two amendments [are] misguided." *Portillo-Munoz*, 643 F.3d at 441. Again, "[w]hatever else the term means or includes, the phrase 'the people' in the Second Amendment of the Constitution does not include aliens illegally in the United States." *Id.* at 442. The Tenth Circuit also declined to equate "the people" in the Second and Fourth Amendments, instead stating only that "*Verdugo-Urquidez* teaches us that 'People' is a word of broader content than 'citizens,' and of narrower content than 'persons.'" *Huitron-Guizar*, 678 F.3d at 1168.

Similarly, although the Fourth Circuit declined to determine whether the term "the people" has the same meaning in each of its constitutional uses, it relied on *Heller*'s "distinct analysis[] that the core right historically protected by the Second Amendment is the right of self-defense by 'law-abiding, responsible

---

assumed that the Second Amendment's protections could extend to illegal aliens and "still easily f[ou]nd § 922(g)(5) constitutional." 678 F.3d at 1169.

citizens.'" *Carpio-Leon*, 701 F.3d at 979 (quoting *Heller*, 554 U.S. at 635). As such, the Fourth Circuit concluded that "illegal aliens do not belong to the class of law-abiding members of the political community to whom the protection of the Second Amendment is given." *Carpio-Leon*, 701 F.3d at 981.

Only the Seventh Circuit has concluded that the Second Amendment applies to aliens unlawfully present in the United States. *Meza-Rodriguez*, 798 F.3d at 669-72. Nonetheless, that court too ultimately held that Section 922(g)(5) did not impermissibly restrict the defendant's rights. *See infra* pp. 26-28.

Because unauthorized aliens do not have a Second Amendment right to bear arms, this Court should affirm the denial of Torres's motion to dismiss.

### D. Even If Some Unauthorized Aliens Are Covered By The Second Amendment, Torres Has Not Demonstrated "Substantial Connections" To The United States To Warrant Second Amendment Protections

Assuming that some unauthorized aliens have Second Amendment rights, such rights extend only to those who have "developed substantial connections as a resident in [the United States]." *Meza-Rodriguez*, 798 F.3d at 671. To demonstrate substantial connections, an alien must show at least (1) that the alien's presence in the United States is voluntary; and (2) that the alien has accepted some societal obligations. *Id.* at 670-71.

Torres failed to raise the "substantial connections" argument in his motion to dismiss and he should not be permitted to do so for the first time on appeal. *United*

*States v. Robertson*, 52 F.3d 789, 791 (9th Cir. 1994). The only exceptions to the general rule against raising an issue not raised in district court are where (1) exceptional circumstances explain appellant's failure to raise the issue in the trial court; (2) the new issues arose during the pendency of the appeal due to a change in the law; or (3) the issue presented is purely one of law and the opposing party will not suffer any prejudice as a result of the failure to raise the issue with the trial court. *Id.* Here, Torres does not claim that any of these exceptions apply. The government would be prejudiced by Torres's failure to raise the issue below because he failed to develop any factual basis for the claim. *See United States v. Navarro*, 800 F.3d 1104, 1113 (9th Cir. 2015) (holding this Court has discretion to decide whether to reach an issue not raised at the district court "where the issue presented is a purely legal one and the record below has been fully developed."); *see also United States v. Valdez-Novoa*, 780 F.3d 906, 914 (9th Cir. 2014).

If the Court concludes that the government would suffer no prejudice and the issue is a purely legal one, this Court should review for plain error. *Chi Mak*, 683 F.3d at 1133. Plain error occurs if (1) there is error, (2) the legal error is clear or obvious, rather than subject to reasonable dispute, (3) the error affected the appellant's substantial rights, and (4) if all that is satisfied, the Court in its discretion, must remedy the error because it "seriously affects the fairness, integrity or public reputation of the judicial proceedings." *Id.* (internal quotation

marks omitted). Torres cannot show plain error because the district court's failure to apply the substantial connections test, in the absence of any case in the circuit adopting its use, cannot be said to be plainly erroneous.

### E. If The Second Amendment Does Apply To Unauthorized Aliens, Section 922(g)(5) Survives Intermediate Scrutiny

This Court need not decide whether the Second Amendment applies to unauthorized aliens if it determines that Section 922(g)(5) is a constitutional limitation on the Second Amendment right to bear arms. Thus, assuming that the term "the people" in the Second Amendment does include at least some unauthorized aliens, this Court can still "easily find § 922(g)(5) constitutional." *Huitron-Guizar*, 678 F.3d at 1169. "Like most rights, the right secured by the Second Amendment is not unlimited. From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Vongxay*, 594 F.3d at 1115 (quoting *Heller*, 554 U.S. at 626).

#### 1. Intermediate scrutiny applies

Although this Court has not yet issued an opinion on the constitutionality of Section 922(g)(5), it has heard challenges to other sub-sections under Section 922(g) and applied intermediate scrutiny. *See Van Der Hule v. Holder*, 759 F.3d 1043, 1051 (9th Cir. 2014) (applying intermediate scrutiny to Section 922(g)(1)); *United States v. Chovan*, 735 F.3d 1127, 1136 (9th Cir. 2013) (same for a Section

24

922(g)(9) facial and as-applied challenge). Moreover, those appellate courts that have applied a "standard of scrutiny" analysis to Section 922(g)(5) have applied intermediate scrutiny. *See Meza-Rodriguez*, 798 F.3d at 672 (Seventh Circuit); *Huitron-Guizar*, 678 F.3d at 1169 (Tenth Circuit). Under this standard, Section 922(g)(5) should be upheld if it is substantially related to an important government interest. *Huitron-Guizar*, 678 F.3d at 1169; *see Chovan*, 735 F.3d at 1141 (adopting intermediate scrutiny in challenge to Section 922(g)(9)).

> 2. *Section 922(g)(5) has a substantial relationship to an important public purpose*

If this Court applies intermediate scrutiny, it should conclude that the restrictions of Section 922(g)(5) are substantially related to important government interests in crime control and public safety, and affirm the district court's order denying Torres's motion to dismiss.

> a. Crime control and public safety are important public purposes

Among the principal purposes of the Gun Control Act of 1968 was the desire to assist law enforcement in combating the increasing prevalence of crime. *Huitron-Guizar*, 678 F.3d at 1169. The 1986 Firearm Owners' Protection Act, which incorporated the alien-in-possession ban from a predecessor statute, sought to keep firearms "away from those deemed irresponsible or dangerous." *Id.* at 1170. "Congress's objective in passing § 922(g)(5) was 'to keep guns out of the

hands of presumptively risky people' and to 'suppress armed violence.'" *Meza-Rodriguez*, 798 F.3d at 673.  The groups of individuals causing Congress concern included aliens unlawfully in the United States.  *Id.*

> b.  Section 922(g)(5) is substantially related to these
>     important public purposes

The only court of appeals to have held that the Second Amendment applies to unauthorized aliens also held that Section 922(g)(5) passes intermediate scrutiny and is constitutional.  *Meza-Rodriguez*, 798 F.3d at 673 (holding that 18 U.S.C. § 922(g)(5) does not impermissibly restrict Meza-Rodriguez's Second Amendment rights).  Any Second Amendment rights an unauthorized alien might have are not violated by Section 922(g)(5) because "Congress's interest in prohibiting persons who are difficult to track and who have an interest in eluding law enforcement is strong enough to support the conclusion that 18 U.S.C. § 922(g)(5) does not impermissibly restrict Meza-Rodriguez's second Amendment right to bear arms." *Id.*  Applying intermediate scrutiny to its analysis of Section 922(g)(5), the law withstands Second Amendment and Equal Protection challenges because the law's prohibition is substantially related to the important government purposes of crime control and public safety.  *Id.*

As some courts of appeals have noted, when Congress enacted Section 922(g)(5), it was concerned about aliens illegally and unlawfully in the United States because they comprise a segment of the population that exists largely off the

grid and have already defied federal law. *Huitron-Guizar*, 678 F.3d at 1170 ("[I]llegal aliens, already in probable present violation of the law, simply do not receive the full panoply of constitutional rights enjoyed by law-abiding citizens."); *Portillo-Munoz*, 643 F.3d at 440 ("Illegal aliens are not law-abiding, responsible citizens or members of the political community…."). Unauthorized aliens may be harder to trace and more likely to assume false identities. *Huitron-Guizar*, 678 F.3d at 1170.

Congress also could reasonably have concluded that firearms possession is incompatible with the fact that many unauthorized aliens may "maintain no permanent address in this country" and may attempt to "elude detection." *United States v. Toner*, 728 F.2d 115, 128 (2d Cir. 1984) (internal quotation marks omitted). Unauthorized aliens also may be less likely to comply with identification and record-keeping requirements that foster public safety. *See Huitron-Guizar*, 678 F.3d at 1170 ("[I]llegal aliens . . . are harder to trace and more likely to assume a false identity" because they live "largely outside the formal system of registration, employment, and identification."). Moreover, unauthorized aliens are subject to removal, and Congress could reasonably have concluded that such aliens, if armed, would pose a risk to immigration officials who attempt to apprehend them.

"The bottom line is that crime control and public safety are indisputably 'important' interests." *Huitron-Guizar*, 678 F.3d at 1170. The ban on the

possession of firearms by illegal aliens is substantially related to the statute's objective "because such persons are able purposefully to evade detection by law enforcement." *Meza-Rodriguez*, 798 F.3d at 673.

**F.    Section 922(g)(5) Does Not Violate The Fifth Amendment**

Torres did not raise a Fifth Amendment due process claim in his motion to dismiss and he should not be permitted to raise it for the first time on appeal. *Robertson*, 52 F.3d at 791. In the opening paragraph of his Notice of Motion, Torres stated that he would move the district court to dismiss the indictment because Section 922(g)(5) violates his rights under the Second, Fifth, and Fourteenth Amendments, however he failed to make any arguments other than his Second Amendment claim in his motion to dismiss. SER 27-33. Torres merely mentioned the Fifth and Fourteenth Amendments once in that opening paragraph, and never again, including during the oral argument on his motion to dismiss. ER 51-66.

Nevertheless, Section 922(g)(5) does not restrict a fundamental constitutional right. *Carpio-Leon*, 701 F.3d at 982. As such, the appropriate standard of review is rational basis review. *Id.*; *see Huitron-Guizar*, 678 F.3d at 1167 (applying rational basis review to equal protection challenge of Section 922(g)(5)).

Torres cannot show that there is no rational relationship between the prohibition on the possession of firearms by unauthorized aliens and the legitimate government interest in public safety. *Carpio-Leon*, 701 F.3d at 982-83. Many courts have recognized that it would be dangerous to allow unauthorized aliens to possess firearms, because they are harder to trace, use false identities, and are more likely to elude detection and resort to illegal activities to maintain a living. *Id.* (listing cases). Like Carpio-Leon, Torres cites empirical studies that he argues demonstrate that unauthorized aliens are no more dangerous to society than legal aliens or citizens. But the statistics cited by Torres (for example, that the violent crime rate among all persons in the United States declined at a time when the population of unauthorized aliens was increasing) are of limited usefulness and do not address the concerns of Congress described above.

Torres cannot demonstrate that Congress acted irrationally when it prohibited illegal aliens from possessing firearms. Therefore, this Court should conclude that Section 922(g)(5) survives rational scrutiny and is constitutional under the Fifth Amendment.

## CONCLUSION

For the reasons set forth above, this Court should affirm the order of the

district court.

Dated: July 15, 2016                              Respectfully submitted,

                                                  BRIAN J. STRETCH
                                                  United States Attorney

                                                  BARBARA J. VALLIERE
                                                  Chief, Appellate Division

                                                  /s/ William Gullotta
                                                  WILLIAM J. GULLOTTA
                                                  Assistant United States Attorney

                                                  Attorneys for Plaintiff-Appellee
                                                  UNITED STATES OF AMERICA

## STATEMENT OF RELATED CASES

Pursuant to Rule 28-2.6(a) of the United States Court of Appeals for the Ninth Circuit, counsel for the United States of America states that he is not aware of related cases to this appeal.

Dated: July 15, 2016    /s/ William Gullotta
          WILLIAM J. GULLOTTA
          Assistant United States Attorney

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32 (a)(7)(C) and Ninth Circuit Rule 32-1, I certify that:

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i) because:

X     the brief contains 6,737 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii); or

___    this brief uses a monospaced typeface and contains_____lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P. (32)(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

X     the brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 program, with 14-font size Times New Roman style; or

___    the brief has been prepared in a monospaced spaced typeface using _____program with ____characters per inch and _____style.

Dated: July 15, 2016                     /s/ William Gullotta_____
                                         WILLIAM J. GULLOTTA
                                         Assistant United States Attorney

## CERTIFICATE OF SERVICE

I, Hui Chen, certify that I am an employee of the Office of the United States

Attorney, Northern District of California, a person over 18 years of age and not a

party to the within action. I certify that on July 15, 2016, I electronically submitted

the

- **Brief for the United States as Appellee**
- **Government's Supplemental Excerpts of Record (1 Volume)**

in the case of *United States v. Victor Torres*, No. 15-10492, with the Clerk of the

Court for the United States Court of Appeals for the Ninth Circuit by using the

appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and

that service will be accomplished by the appellate CM/ECF system.


Dated: July 15, 2016                         /s/ Hui Chen

                                             Hui Chen, Paralegal


33