**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>*Plaintiff-Appellee*,<br><br>v.<br><br>VICTOR MANUEL TORRES,<br>*Defendant-Appellant.* | No. 15-10492<br><br>D.C. No.<br>5:14-cr-00255-EJD-1<br><br>OPINION |

Appeal from the United States District Court
for the Northern District of California
Edward J. Davila, District Judge, Presiding

Argued and Submitted December 12, 2016
San Francisco, California

Filed January 8, 2019

Before: Sidney R. Thomas,[*] Chief Judge, N. Randy Smith,
Circuit Judge, and Sharon L. Gleason,[**] District Judge.

Opinion by Judge N.R. Smith

---

[*] Following the retirement of Judge Kozinski, Chief Judge Sidney R. Thomas was randomly drawn to replace him. Ninth Cir. Gen. Order 3.2.h. Chief Judge Thomas has read the briefs, reviewed the record, and watched a video recording of oral argument.

[**] The Honorable Sharon L. Gleason, United States District Judge for the District of Alaska, sitting by designation.

## SUMMARY***

---

### Criminal Law

The panel affirmed a conviction for possessing a firearm while being an alien unlawfully in the United States in violation of 18 U.S.C. § 922(g)(5)(A).

Assuming without deciding that unlawful aliens in this country hold some degree of rights under the Second Amendment, the panel held that § 922(g)(5) is constitutional under intermediate scrutiny.

---

### COUNSEL

Adam G. Gasner (argued), Law Office of Adam G. Gasner, San Francisco, California, for Defendant-Appellant.

William James Gullotta (argued), Special Assistant United States Attorney; Barbara J. Valliere, Chief, Appellate Division; United States Attorney's Office, Oakland, California; for Plaintiff-Appellee.

---

*** This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

## OPINION

N.R. SMITH, Circuit Judge:

Assuming that unlawful aliens in this country hold some degree of rights under the Second Amendment, a statute prohibiting the possession of firearms by an alien unlawfully present in the United States withstands constitutional scrutiny and is a valid exercise of Congress's authority.

## I. BACKGROUND

Defendant Victor Manuel Torres appeals his conviction for possessing a firearm while "being an alien . . . illegally or unlawfully in the United States," in violation of 18 U.S.C. § 922(g)(5)(A).[1] Torres was born in Mexico in 1985. Approximately four years later, he, his younger sister, and his mother moved to San Jose, California, to join Torres's father, who had entered the United States a year earlier. Nothing in the record suggests that either of Torres's parents ever had an immigration status through which Torres could qualify for legal status in the United States. Torres was enrolled in the school system in San Jose from 1991 until he was expelled in 2000. This expulsion resulted from Torres's affiliation with the Sur Santos Pride gang, which he joined at age fourteen. Because of his gang involvement and attendant trouble at school, Torres's parents sent him back to live in Mexico in

---

[1] The discourse relevant to our discussion uses a variety of terms, such as "unlawful alien," "illegal alien," and "undocumented immigrant" (among several others) to refer to a person who is not a citizen of the United States and whose presence in the United States is not lawful. Throughout this opinion, we use the term "unlawful alien" to refer to a person with this immigration status.

2002, when he was sixteen years old. After he reached adulthood, Torres attempted to unlawfully enter the United States three times in June 2005. During each of his first two attempts, Torres was apprehended and permitted to voluntarily return to Mexico. However, he successfully entered the United States unlawfully on the third attempt. Upon this reentry, Torres joined his family in San Jose and began working with his father in landscaping. In 2012, Torres married a United States citizen in San Jose. However, Torres never applied for legal status.

In March 2014, a citizen reported to the Los Gatos Police Department that there was a suspicious pickup truck in a nearby parking lot and that its driver might be attempting to sell a stolen bicycle. When officers arrived, the driver's side door of the suspicious pickup was open. The officers found Torres working on something on the bed of the vehicle. Through the open driver's side door, officers saw a backpack and what appeared to be counterfeit license plates. The bed of the pickup contained "a newer looking Trek road bike." Torres told the officers that he owned the bicycle and that he had received it as a gift in December 2013. However, by reporting the bicycle's serial number to dispatch, officers confirmed that it had been reported stolen two days earlier. When later confronted with this information, Torres admitted he knew the bicycle was stolen. Officers requested that Torres provide identification. Torres responded that it was in his vehicle. When Torres began to reach into the pickup to allegedly retrieve his identification, the officers stopped him out of concern for safety. An officer then looked into the vehicle and did not see any identification, but the officer asked if he could look inside Torres's backpack. Torres consented. Inside the backpack, the officer found a loaded .22

caliber revolver, bolt cutters, and what appeared to be two homemade silencers for the firearm.

Upon this discovery, officers placed Torres under arrest. In addition to the contents of Torres's backpack, the subsequent search of his vehicle revealed a small amount of methamphetamine and a glass pipe. Officers transported Torres to a holding facility where they explained his *Miranda* rights to him before conducting an interview. In response to questions about two of his tattoos that indicated a gang affiliation, Torres admitted to being an active member of Sur Santos Pride. According to Torres, the stolen bicycle and the backpack containing the firearm had been placed in his vehicle by a friend (a fellow gang member), whose identity Torres refused to reveal.

Subsequently, Torres was federally indicted in the Northern District of California for one count of being an unlawful alien in possession of a firearm, in violation of 18 U.S.C. § 922(g)(5)(A).[2] Torres moved to dismiss the indictment, arguing that Second Amendment protections apply to unlawful aliens and that § 922(g)(5) violates the Second Amendment. The district court denied the motion, and the case proceeded to trial, resulting in Torres's conviction. The district court imposed a sentence of twenty-seven months of incarceration followed by three years of supervised release.

On appeal, Torres admits that he is an alien unlawfully present in the United States and that he possessed the firearm found in his vehicle. However, he contests his conviction by

---

[2] Torres was also charged with several offenses in California state court, which are not at issue in this case.

challenging on constitutional grounds the federal statute under which he was convicted.

## II.  STANDARD OF REVIEW

We consider challenges to the constitutionality of a statute de novo. *United States v. Garcia*, 768 F.3d 822, 827 (9th Cir. 2014).

## III.  DISCUSSION

The Second Amendment to the United States Constitution guarantees that "the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. We must answer, as an issue of first impression in our circuit, whether this right is violated by a federal criminal statute prohibiting the possession of a firearm by an alien unlawfully in this country. The Second Amendment's application to unlawful aliens has been widely debated among courts and scholars in recent years, with analytical divisions even among those agreeing in result. We proceed to address this issue, first, by outlining the general framework to analyze challenges under the Second Amendment. We then review the approach of other circuits to Second Amendment challenges to the specific statute at issue. Finally turning to the parties' arguments, we assume (without deciding) that the Second Amendment extends to unlawful aliens, and we conclude that § 922(g)(5) is constitutional under intermediate scrutiny.

Central to the rights guaranteed by the Second Amendment is "the inherent right of self-defense." *District of Columbia v. Heller*, 554 U.S. 570, 628 (2008). However, while the Second Amendment "guarantee[s] the individual

right to possess and carry weapons in case of confrontation," the right "is not unlimited." *Id.* at 592, 626. Congress may place certain limits on where the right is exercised, how the right is exercised, and who may exercise the right. *See id.* at 626–27; *United States v. Carpio-Leon*, 701 F.3d 974, 977 (4th Cir. 2012) ("[T]he Second Amendment does not guarantee the right to possess for every purpose, to possess every type of weapon, to possess at every place, or to possess by every person."); *United States v. Huitron-Guizar*, 678 F.3d 1164, 1166 (10th Cir. 2012) ("The right to bear arms, however venerable, is qualified by what one might call the 'who,' 'what,' 'where,' 'when,' and 'why.'"). In fact, Congress has determined that certain groups should be prohibited altogether from possessing firearms. *See* 18 U.S.C. § 922(g). This case concerns such a limitation. Under § 922(g)(5), it is unlawful for an alien "illegally or unlawfully in the United States . . . to . . . possess in or affecting commerce, any firearm." Torres challenges this prohibition.[3] According to Torres, § 922(g)(5) violates the Second Amendment, because it completely destroys (rather than limits) Second Amendment protections as to an entire class of people. *See Heller*, 554 U.S. at 628–29.

In *United States v. Chovan*, we adopted a two-step inquiry to analyze claims that a law violates the Second Amendment.

---

[3] Torres claims to make facial and as-applied challenges to this statute. However, we agree with the government that Torres fails to explain his theory of how § 922(g)(5) is unconstitutional as applied to him. Therefore, we consider only the facial challenge. *See Entm't Research Grp., Inc. v. Genesis Creative Grp., Inc.*, 122 F.3d 1211, 1217 (9th Cir. 1997) ("We review only issues which are argued specifically and distinctly in a party's opening brief. We will not manufacture arguments for an appellant, and a bare assertion does not preserve a claim . . . ." (citation omitted)).

735 F.3d 1127, 1136 (9th Cir. 2013). This test "(1) asks whether the challenged law burdens conduct protected by the Second Amendment and (2) if so, directs courts to apply an appropriate level of scrutiny." *Id*. Accordingly, we turn to the first question.

## A. Does § 922(g)(5) burden conduct protected by the Second Amendment?

Under the first *Chovan* step, we cannot "apply the Second Amendment to protect a right that does not exist under the Amendment." *Peruta v. Cty. of San Diego*, 824 F.3d 919, 942 (9th Cir. 2016) (en banc), *cert. denied sub nom. Peruta v. California*, 137 S. Ct. 1995 (2017). Therefore, the first step of our analysis requires us to explore the amendment's reach "based on a 'historical understanding of the scope of the [Second Amendment] right.'" *Jackson v. City & Cty. of San Francisco*, 746 F.3d 953, 960 (9th Cir. 2014) (quoting *Heller*, 554 U.S. at 625). A law does *not* burden Second Amendment rights, if it either falls within "one of the 'presumptively lawful regulatory measures' identified in *Heller*" or regulates conduct that historically has fallen outside the scope of the Second Amendment. *Id.*

The non-exhaustive examples of presumptively lawful regulations include "longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Heller*, 554 U.S. at 626–27 & n.26; *see also United States v. Vongxay*, 594 F.3d 1111, 1115 (9th Cir. 2010). "These measures comport with the Second Amendment because they affect individuals or conduct unprotected by the

right to keep and bear arms." *Binderup v. Attorney Gen. U.S.*, 836 F.3d 336, 343 (3d Cir. 2016) (en banc), *cert. denied sub nom. Sessions v. Binderup*, 137 S. Ct. 2323 (2017), *and cert. denied sub nom. Binderup v. Sessions*, 137 S. Ct. 2323 (2017). However, the government does not argue that § 922(g)(5) is a presumptively lawful regulation, so that question is not before us. Therefore, we focus our inquiry on whether possession of firearms by unlawful aliens falls within the "historical understanding of the scope of the [Second Amendment] right." *Heller*, 554 U.S. at 625; *see also id.* at 626–28 (outlining some of the historical limits on the scope of the Second Amendment right).

In this case, the question of whether possession of firearms by unlawful aliens has historically fallen outside the Second Amendment requires an examination of whether unlawful aliens are included within the term "the people." The text of the Second Amendment plainly states that the right "to keep and bear Arms" is reserved only to "the people." Far from plain, however, is the scope of those who fall within "the people." On this question, there are two Supreme Court cases that provide some guidance: *United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990), and *Heller*.

In *Verdugo-Urquidez*, the Supreme Court held that a person who "was a citizen and resident of Mexico with no voluntary attachment to the United States, and the place searched was located in Mexico," was not within "the people" protected by the Fourth Amendment. 494 U.S. at 274–75. The Court explained, "the people" is "a term of art employed in select parts of the Constitution." *Id.* at 265. After examining the text of several amendments, the Court concluded:

> While this textual exegesis is by no means
> conclusive, it suggests that "the people"
> protected by the Fourth Amendment, and by
> the First and Second Amendments, and to
> whom rights and powers are reserved in the
> Ninth and Tenth Amendments, refers to a
> class of persons [(1)] who are part of a
> national community or [(2)] who have
> otherwise developed sufficient connection
> with this country to be considered part of that
> community.

*Id.* (citing *United States ex rel. Turner v. Williams*, 194 U.S.
279, 292 (1904)).

In *Heller*, the Supreme Court conducted its "first in-depth
examination of the Second Amendment." 554 U.S. at 635.
*Heller* addressed a Second Amendment challenge to "a
District of Columbia prohibition on the possession of usable
handguns in the home." *Id.* at 573. The Court engaged in
textual and historical analyses, holding that the Second
Amendment protects an "individual right," unrelated to
service in a militia, and that the District of Columbia's
prohibition of usable handguns in the home was
unconstitutional. *Id.* at 592–94, 635. Throughout its opinion,
the Court described the Second Amendment as "protect[ing]
the right of *citizens*" and "belong[ing] to all *Americans*." *Id.*
at 581, 595 (emphasis added). The Court also wrote that the
amendment "surely elevates above all other interests the right
of *law-abiding*, *responsible citizens* to use arms in defense of
hearth and home." *Id.* at 635 (emphasis added).

However, the *Heller* decision did not resolve *who* had the
Second Amendment right; *Heller* resolved if there were an

individual right *per se* under the Second Amendment. *Id.* at 595 ("There seems to us no doubt, on the basis of both text and history, that the Second Amendment conferred an individual right to keep and bear arms."); *see also Kachalsky v. Cty. of Westchester*, 701 F.3d 81, 88–89 (2d Cir. 2012) (explaining that, after the Court concluded the Second Amendment was meant to protect individual rights, "[t]here was no need in *Heller* to further define [its] scope . . . ."). And, the *Heller* Court also stated that "the people," as a term, "unambiguously refers to all members of the political community, not an unspecified subset" and block-quoted the definition of "the people" as quoted *supra* from *Verdugo-Urquidez*. *Heller*, 554 U.S. at 580.

Using these two guiding cases, five of our sister circuits have addressed the question of § 922(g)(5)'s constitutionality; however, the inconsistency in reasoning among these courts—though unanimous in ultimate outcome—demonstrates that *Heller* and *Verdugo-Urquidez* do not provide us a definitive outcome.

In 2011, the Fifth Circuit addressed this question in *United States v. Portillo-Munoz*, 643 F.3d 437 (5th Cir. 2011). The defendant in *Portillo-Munoz*, an unlawful alien, argued that under *Verdugo-Urquidez*'s construction of "the people," he should be considered as within the scope of the phrase because he had "developed sufficient connection[s]" to the United States. *Id.* at 440. The Fifth Circuit concluded that, "[w]hatever else the term means or includes, the phrase 'the people' in the Second Amendment of the Constitution does not include aliens illegally in the United States." *Id.* at 442. To reach its holding, the *Portillo-Munoz* court relied heavily on the Supreme Court's language from *Heller* that described those persons who held a Second Amendment right

as "members of the political community," "Americans," and "law-abiding, responsible citizens." *Id.* at 440. The court concluded that "aliens who enter or remain in this country illegally and without authorization" are not included within the common usage of those terms. *Id.* Further, the court explicitly rejected the defendant's *Verdugo-Urquidez* argument, stating that "neither this court nor the Supreme Court has held that the Fourth Amendment extends to a native and citizen of another nation who entered and remained in the United States illegally." *Id.* It explained that, even though "the people" may be in both amendments, that fact does not "mandate[] a holding that the two amendments cover exactly the same groups of people." *Id.*[4]

Similarly, the Fourth Circuit in *Carpio-Leon* held that "illegal aliens do not belong to the class of law-abiding members of the political community to whom the protection of the Second Amendment is given." 701 F.3d at 981. To reach this conclusion, the court acknowledged that *Heller* held "the people" is a "term of art" and cited to *Verdugo-Urquidez* to define who is included in that term. *Id.* at 978. However, the Fourth Circuit concluded that *Heller*'s specific use of the phrases "law-abiding," "Americans," and "citizenship" meant the "Supreme Court's precedent is therefore not clear on whether 'the people' includes illegal aliens." *Id.* at 978–81. It then reasoned that the *Heller* Court's holding that the "core" of the Second Amendment right "is the right of self-defense by '*law-abiding*, responsible

---

[4] Shortly after the *Portillo-Munoz* decision, the Eighth Circuit, without significant discussion, agreed with the Fifth Circuit and held that "the protections of the Second Amendment do not extend to aliens illegally present in this country." *United States v. Flores*, 663 F.3d 1022, 1023 (8th Cir. 2011) (per curiam).

citizens'" was a "distinct analysis." *Id.* at 978–79 (emphasis in original) (quoting *Heller*, 554 U.S. at 635). The Fourth Circuit then concluded that "[t]he *Heller* court reached the Second Amendment's connection to law-abiding citizens through a historical analysis, independent of its discussion about who constitutes 'the people.'" *Id.* at 979. It then conducted a historical inquiry as to whether or not unlawful aliens were included in the definition of "law-abiding," and concluded that "Carpio-Leon's historical evidence does not controvert the historical evidence supporting the notion that the government could disarm individuals who are not law-abiding members of the political community." *Id.* at 979–81.

Unlike the Fourth, Fifth, and Eighth Circuits, when confronted with the instant question, the Seventh Circuit held, in *United States v. Meza-Rodriguez*, 798 F.3d 664 (7th Cir. 2015), that *Heller*'s notation that the Second, First, and Fourth Amendments all use the phrase "the people," and its citation to *Verdugo-Urquidez* was sufficient to overcome the Supreme Court's "passing references" to "law-abiding citizens" and "members of the political community," which did not define "people." *Id*. at 669–70. The Seventh Circuit reasoned that "[a]n interpretation of the Second Amendment as consistent with the other amendments passed as part of the Bill of Rights has the advantage of treating identical phrasing in the same way and respecting the fact that the first ten amendments were adopted as a package." *Id.* at 670. Accordingly, the *Meza-Rodriguez* court found the *Verdugo-Urquidez* test was the appropriate mechanism to determine if an unlawful alien fell within the scope of the Second Amendment right. *Id.* ("At a minimum, *Verdugo-Urquidez* governs the applicability of the Fourth Amendment to noncitizens."). Ultimately, the court held the unlawful alien had sufficient connections to the United States because he

had "lived continuously in the United States for nearly all his life," but upheld the statute under intermediate scrutiny as an appropriate exercise of Congressional authority. *Id.* at 670–73.

Finally, in *Huitron-Guizar*, the Tenth Circuit, like the Seventh Circuit, refused to find that *Heller*'s use of "citizen" was a conclusive determination that unlawful aliens are not within the scope of the Second Amendment right, but, instead, *assumed* for the purposes of the analysis that (at least some) unlawful aliens fall within the scope and concluded the statute passed intermediate scrutiny. 678 F.3d at 1168–70. The Tenth Circuit's conclusion was grounded in the fact that the *Heller* decision did not purport to decide the scope of the phrase "the people" in the Second Amendment, but, rather, "the question in *Heller* was the amendment's *raison d'être*—does it protect an individual or collective right?—and aliens were not part of that calculus." *Id.* at 1168. Further, the Tenth Circuit was concerned with finding that *Heller*'s decision excluded unlawful aliens because it could not conclude "the word 'citizen' was used deliberately to settle the question, not least because doing so would conflict with *Verdugo-Urquidez*, a case *Heller* relied on." *Id.* As such, because of the "large and complicated" question of whether unlawful aliens were included in the scope of the Second Amendment, the Tenth Circuit concluded the prudent course of action was to assume so and, ultimately, concluded § 922(g)(5) passed intermediate scrutiny. *Id.* at 1169–70.

Here, the Government primarily focuses its argument on the approaches of the Fourth, Fifth, and Eighth Circuits by arguing that unlawful aliens are not included in "the people." First, the government, relying on language from *Heller*, argues that historical evidence supports the conclusion that

unlawful aliens "are not law-abiding, responsible citizens," because "the government traditionally had the authority to disarm people who were not part of the political community, as well as people who were perceived as potentially disloyal or dangerous." Second, the Government argues that post-*Heller*, the Second Amendment right is "connected to citizenship or membership in the national political community," and unlawful aliens are not in those categories.

However, we agree with the Tenth Circuit's approach, because we believe the state of the law precludes us from reaching a definite answer on whether unlawful aliens are included in the scope of the Second Amendment right. The Tenth Circuit correctly held that this question is "large and complicated." *Id.* at 1169. Therefore, on this record, we find it imprudent to examine whether Torres (as an unlawful alien) falls within the scope of the Second Amendment right. As such, we *assume* (without deciding) that unlawful aliens, such as Torres, fall within the scope of the Second Amendment right as articulated under *Heller* and *Vergudo-Urquidez* and proceed to the appropriate scrutiny we should give to § 922(g)(5). *Silvester v. Harris*, 843 F.3d 816, 826–27 (9th Cir. 2016) ("We assume, without deciding, that the regulation [imposing a waiting period between purchase and delivery of a firearm] is within the scope of the Amendment and is not the type of regulation that must be considered presumptively valid."); *Chovan*, 735 F.3d at 1137 (assuming existence of Second Amendment rights where record was insufficient to show domestic violence misdemeanants were historically excluded from the scope of the Second Amendment); *United States v. Chester*, 628 F.3d 673, 681–82 (4th Cir. 2010) (assuming that Second Amendment rights were intact, where the evidence was inconclusive on that question); *cf. Mahoney v. Sessions*, 871 F.3d 873, 879 (9th Cir. 2017) ("[B]ecause of

the lack of historical evidence in the record before us, we assume, without deciding, that the UF Policy burdens conduct falling within the scope of the Second Amendment right." (citations omitted)).

## B. Does § 922(g)(5) impose a permissible restriction on the Second Amendment right of an unlawful alien?

Before we can conclude whether § 922(g)(5) imposes a permissible restriction on the Second Amendment rights of aliens unlawfully present in the United States, we must first determine the appropriate level of scrutiny to apply.

### 1. Level of scrutiny

Although Torres argues that we should apply strict scrutiny, he acknowledges that the relevant case law has not made clear what standard is appropriate.[5] We have previously concluded that laws burdening Second Amendment rights must withstand more searching scrutiny than rational basis

---

[5] Cases from other circuits considering § 922(g)(5) do not conclusively show the appropriate level of scrutiny. *See Meza-Rodriguez*, 798 F.3d at 672–73 (applying review akin to intermediate scrutiny); *Carpio-Leon*, 701 F.3d at 982–83 (not reaching the issue of the appropriate scrutiny under the Second Amendment but applying rational basis review to Fifth Amendment challenge, reasoning that unlawful aliens do not have a fundamental right to bear arms); *Huitron-Guizar*, 678 F.3d at 1169 (assuming intermediate scrutiny applies to Second Amendment claim, based on comparison to challenge made under § 922(g)(8)'s prohibition for one who is subject to a domestic violence protection order; but applying rational basis review to equal protection claim, because that is the appropriate standard under which to scrutinize "[f]ederal statutes that classify based on alienage"); *see generally Flores*, 663 F.3d 1022 (not reaching the question of the appropriate level of scrutiny); *Portillo-Munoz*, 643 F.3d 437 (same).

review. *Chovan*, 735 F.3d at 1137. The level of scrutiny we apply "depend[s] on (1) 'how close the law comes to the core of the Second Amendment right,' and (2) 'the severity of the law's burden on the right.'" *Id.* at 1138 (quoting *Ezell v. City of Chicago*, 651 F.3d 684, 703 (7th Cir. 2011)). "A law that implicates the core of the Second Amendment right and severely burdens that right warrants strict scrutiny." *Silvester*, 843 F.3d at 821. However, intermediate scrutiny is appropriate "if a challenged law does not implicate a core Second Amendment right, or does not place a substantial burden on the Second Amendment right." *Jackson*, 746 F.3d at 961. Although not dispositive of the question, we note that there has been "near unanimity in the post-*Heller* case law that, when considering regulations that fall within the scope of the Second Amendment, intermediate scrutiny is appropriate." *Silvester*, 843 F.3d at 823.

In considering the first question to determine the appropriate level of scrutiny—the proximity of the challenged law to "the core of the Second Amendment right"—"*Heller* tells us that the core of the Second Amendment is 'the right of *law-abiding*, *responsible* citizens to use arms in defense of hearth and home.'" *Chovan*, 735 F.3d at 1138 (emphasis added) (quoting *Heller*, 554 U.S. at 635). Under a different subdivision of § 922(g), which prohibits firearm possession for domestic violence misdemeanants, we held in *Chovan* that "Section 922(g)(9) does not implicate this core Second Amendment right because it regulates firearm possession for individuals with criminal convictions." *Id.* The defendant's asserted right to possess a firearm for self-defense was not within the core of the Second Amendment (as identified in *Heller*), because he was not a "*law-abiding*, *responsible* citizen." *Id.* (quoting *Chester*, 628 F.3d at 682–83). Likewise, § 922(g)(5) does not burden this core right, because the

prohibition applies only to those who are present in the
United States "*illegally* or *unlawfully*." 18 U.S.C.
§ 922(g)(5)(A) (emphasis added).

Under the second question for determining the level of
scrutiny to apply—"the severity of the law's burden on the
right" at issue—we found in *Chovan* a "quite substantial"
burden on Second Amendment rights from a statute imposing
a lifelong "'total prohibition' on firearm possession for a
class of individuals." *Chovan*, 735 F.3d at 1138 (analyzing
§ 922(g)(9)). We found this burden tempered, however, by
exemptions from the lifetime ban for persons whose
conviction "has been expunged or set aside" or who have
"been pardoned or . . . had [their] civil rights restored." *Id.* at
1130, 1138; 18 U.S.C. § 921(a)(33)(B)(ii). Thus, "we applied
'intermediate' rather than 'strict' judicial scrutiny in part
because section 922(g)(9)'s 'burden' on Second Amendment
rights was 'lightened' by those mechanisms." *Fisher v.
Kealoha*, 855 F.3d 1067, 1071 n.2 (9th Cir. 2017) (citing
*Chovan*, 735 F.3d at 1138). The burden found in § 922(g)(5)
is similarly tempered, because there is nothing indicating that
the prohibition on firearm possession extends beyond the time
that an alien's presence in the United States is unlawful.
The factual condition triggering the prohibition in
§ 922(g)(9)—that a person "*has been* convicted" of a
domestic violence misdemeanor—is phrased in the past tense,
indicating that (once that event occurs) the ban continues for
life, unless one of the enumerated exceptions applies.
Conversely, the factual condition triggering the prohibition in
§ 922(g)(5)—that a person "*is* illegally or unlawfully in the
United States"—is phrased in the present tense, indicating
that the person affected by that provision may remove himself
from the prohibition by acquiring lawful immigration status.
The burden imposed by § 922(g)(5) is, therefore, tempered.

Because § 922(g)(5) does not implicate the *core* Second Amendment right, and because its burden is tempered, we proceed to apply intermediate scrutiny. *See Fyock v. Sunnyvale*, 779 F.3d 991, 998–99 (9th Cir. 2015) ("Intermediate scrutiny is appropriate if the regulation at issue does not implicate the core Second Amendment right *or* does not place a substantial burden on that right."); *Chovan*, 735 F.3d at 1138.

### 2.  Application of intermediate scrutiny

For a challenged statute to survive intermediate scrutiny, it must have (1) a "significant, substantial, or important" government objective; and (2) a reasonable fit between that objective and the conduct regulated. *Chovan*, 735 F.3d at 1139. A statute need not utilize "the least restrictive means of achieving its interest" in order to withstand intermediate scrutiny. *Fyock*, 779 F.3d at 1000. Instead, the statute simply needs to "promote[] a 'substantial government interest that would be achieved less effectively absent the regulation.'" *Id.* (quoting *Colacurcio v. City of Kent*, 163 F.3d 545, 553 (9th Cir. 1998)).

The government argues that it has important "interests in crime control and public safety." We agree. "The [government] has the important government interest of ensuring the safety of both the public and its police officers." *Mahoney*, 871 F.3d at 882 (citing *United States v. Salerno*, 481 U.S. 739, 748 (1987); *Jackson*, 746 F.3d at 965); *see also Binderup*, 836 F.3d at 390 ("The stated purpose of the 1968 revision was to curb crime by keeping firearms out of the hands of those not legally entitled to possess them because of age, criminal background, or incompetency." (Fuentes, J., concurring in part and dissenting in part) (internal citations

omitted)); *Meza-Rodriguez*, 798 F.3d at 673 ("Congress's objective in passing § 922(g) was 'to keep guns out of the hands of presumptively risky people' and to 'suppress[] armed violence.'" (alteration in original) (quoting *United States v. Yancey*, 621 F.3d 681, 683–84 (7th Cir. 2010))). These government interests are particularly applicable to those subject to removal. "[T]hose who show a willingness to defy our law are . . . a group that ought not be armed when authorities seek them." *Huitron-Guizar*, 678 F.3d at 1170. If armed, unlawful aliens could pose a threat to immigration officers or other law enforcement who attempt to apprehend and remove them.

Further, "[unlawful aliens] often live 'largely outside the formal system of registration, employment, and identification, [and] are harder to trace and more likely to assume a false identity.'" *Meza-Rodriguez*, 798 F.3d at 673 (quoting *Huitron-Guizar*, 678 F.3d at 1170). Therefore, "the ban on the possession of firearms by [unlawful aliens] is substantially related to the statute's general objectives because such persons are able purposefully to evade detection by law enforcement." *Id.*

Finally, "the government has a[] strong interest in preventing people who already have disrespected the law (including, in addition to aliens unlawfully in the country, felons, § 922(g)(1), fugitives, § 922(g)(2), and those convicted of misdemeanor crimes of domestic violence, § 922(g)(9)) from possessing guns." *Id.* Section 922(g)(5) and other concurrent additions to § 922(g) "reflect[] Congress's judgment that persons within these categories 'may not be trusted to possess a firearm without becoming a threat to society.'" *Binderup*, 836 F.3d at 390 & n.98 (Fuentes, J., concurring in part and dissenting in part) (quoting

*Scarborough v. United States*, 431 U.S. 563, 572 (1977)). "[T]hese restrictions . . . disarm groups whose members Congress believes are unable or unwilling to conduct themselves in conformity with the responsibilities of citizenship." *Id.* at 390–91.

In sum, the government's interests in controlling crime and ensuring public safety are promoted by keeping firearms out of the hands of unlawful aliens—who are subject to removal, are difficult to monitor due to an inherent incentive to falsify information and evade law enforcement, and have already shown they are unable or unwilling to conform their conduct to the laws of this country. These important government interests "would be achieved less effectively" were it not for § 922(g)(5). *Fyock*, 779 F.3d at 1000.[6] Accordingly, § 922(g)(5) survives intermediate scrutiny.

## IV. CONCLUSION

The present state of the law leaves us unable to conclude with certainty whether aliens unlawfully present in the United States are part of "the people" to whom Second Amendment protections extend. Nonetheless, assuming that unlawful aliens do hold some degree of Second Amendment rights,

---

[6] Although a prohibition applying to all unlawful aliens may be over-inclusive, a statute need not utilize "the least restrictive means of achieving its interest" in order to withstand intermediate scrutiny. *Fyock*, 779 F.3d at 1000; *see also Huitron-Guizar*, 678 F.3d at 1170 (recognizing that § 922(g)(1)'s prohibition on firearm possession by all those convicted of felonies is a valid restriction, despite the reality that "[t]he class of convicted felons, too, includes non-violent offenders").

those rights are not unlimited, and the restriction in § 922(g)(5) is a valid exercise of Congress's authority.[7]

**AFFIRMED**.

---

[7] This conclusion also necessarily disposes of Torres's derivative equal protection and due process claims. *Teixeira v. Cty. of Alameda*, 822 F.3d 1047, 1052 (9th Cir.), *reh'g en banc granted*, 854 F.3d 1046 (9th Cir. 2016); *see also Portillo-Munoz*, 643 F.3d at 442 n.4 (explaining that, because the statute at issue (§ 922(g)(5)) was a federal law to which the Bill of Rights directly applied (without incorporation), the alien could pursue the right only under the Second Amendment and could not "look to the due process clause as an additional source of protection for a right to keep and bear arms" (citing *Graham v. Connor*, 490 U.S. 386, 394–95 (1989))).